**Thomas Neil HENDRICKSON, Jr.; Bertha M. Foy, a minor, by her next friend, Blake Parker; and Sessions Harper, a minor, by his next friend, Blake Parker; individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Charles GRIGGS, individually and in his capacity as Sheriff of Webster County; Leonard Hansch, Chairman, and Elmer Pliner, Joseph Cunningham, Jill Messerly and Myron Groat, individually and as members of the Webster County Board of Supervisors; Webster County, Iowa; Terry E. Branstad, individually and in his capacity as Governor of the State of Iowa; and Richard R. Ramsey, individually and in his capacity as Executive Director of the Iowa Criminal and Juvenile Justice Planning Agency, Defendants.**

No. 2C 84–3012.

United States District Court,
N.D. Iowa, C.D.

April 9, 1987.

Harry F. Swanger and John R. Bird, St. Louis, Mo., Blake Parker, Fort Dodge, Iowa, for plaintiffs.

Carlton G. Salmons, Des Moines, Iowa, for Webster County defendants.

Charles K. Phillips, Asst. Atty. Gen., Des Moines, for State defendants.

**ORDER**

DONALD E. O'BRIEN, Chief Judge.

The Court has before it:

—motions for dismissal under Rule 12(b)(6) and 12(b)(7), appointment of a guardian ad litem under Rule 17, and summary judgment filed by Defendants Griggs, Hansch, Pliner, Cunningham, Messerly, Groat, and Webster County (hereinafter the "County Defendants");

—a motion for summary judgment and a motion for a temporary restraining order filed by the plaintiffs; and

—a motion for summary judgment filed by Defendants Branstad and Ramsey (hereinafter the "State Defendants").

Because the motion for a temporary restraining order was considered at a hearing at which all defendants were represented, the Court will treat that motion as a motion for a preliminary injunction. *Walker v. O'Bannon*, 487 F.Supp. 1151, 1153 (W.D. Pa.1980). The plaintiffs have filed a motion to recertify the plaintiff class and create a defendant class, although this motion will be held in abeyance by the Court. While all motions for summary judgment were filed before the plaintiffs' motion for a TRO, the Court will address the motions for summary judgment today only to the degree necessary to determine whether the plaintiffs' request for a TRO must be denied as a matter of law. For the reasons given below, the Court denies the defendants' motions for summary judgment insofar as they involve the following assertions:

1) The plaintiffs' § 1983 claims are barred by res judicata and collateral estoppel.

2) The plaintiffs must exhaust administrative remedies.

3) The Office of Juvenile Justice and Delinquency Prevention ("OJJDP") has primary jurisdiction over the defendant's statutory § 1983 claim.

4) The plaintiffs' statutory § 1983 claim is not ripe for adjudication.

5) The plaintiffs must proceed through a guardian ad litem.

6) The plaintiffs' JJDPA claim must be dismissed because a necessary and indispensable party has not been sued.

7) Section 1983 does not provide a cause of action to seek redress for violations of rights created by § 5633 of the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5601, *et seq.* ("JJDPA").

The Court grants the state defendants' motion for summary judgment against the plaintiffs' prayer for an order compelling the state to return OJJDP funds already received and stop receiving such funds. The Court postpones consideration of the plaintiffs' motion for summary judgment and the remaining portions of the defendants' motions for summary judgment, and grants a substantially modified version of the plaintiffs' motion for a preliminary injunction.

All defendants have moved for dismissal or summary judgment on plaintiffs' claim that they are entitled to relief because several jailing practices of the county defendants violate the JJDPA. The plaintiffs claim that the state plan requirements in § 5633 of the JJDPA create rights enforceable under § 1983, or in the alternative, give rise to an implied cause of action under the four-step analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[1]

The Juvenile Justice and Delinquency Prevention Act was enacted in 1974, with relevant amendments in 1977, 1980 and 1984. Title II of the original Act established a formula grant program under which states and local governments could seek funds from the OJJDP for projects and programs related to juvenile justice and delinquency. Pub.L. No. 93–415, Title II, § 221, 88 Stat. 1119 (1974) (codified as amended at 42 U.S.C. § 5631 (1982)). Section 223 of the Act required states seeking formula grants to submit a plan for carrying out the purposes of the Act and established a list of state plan requirements.

Section 223, *supra* (codified at § 5633). Under a 1980 amendment, participating states have been required to submit annual performance reports to "describe the status of compliance with state plan requirements." Pub.L. No. 96–509, § 11(a)(1) (codified at § 5633(a)).

This case involves the defendants' compliance with three such requirements:

1. *The deinstitutionalization of status offenders.* Section 5633(a)(12)(A), as amended in 1977 and 1980, requires each plan to "provide within three years after submission of the initial plan that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses which do not constitute violations of valid court orders, or such nonoffenders as dependent or neglected children, shall not be placed in secure detention facilities or secure correctional facilities." [2] (Hereinafter "subsection 12").

2. *The ban on regular contact between juveniles and incarcerated adults.* Section 5633(a)(13) of the original Act requires the plan to "provide that juveniles alleged to be or found to be delinquent and youth within the purview of paragraph 12 shall not be detained or confined in any institution in which they have regular contact with adult persons incarcerated because they have been convicted of a crime or are awaiting trial or criminal charges." (Hereinafter "subsection 13").

3. *The jail removal mandate.* Finding that "the time has come to go far-

---

1. Two federal courts have previously addressed this question. One summarily found a cause of action, *Kentucky Association of Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1247–48 (W.D. Ky.1980), *aff'd,* 674 F.2d 582 (6th Cir.1982), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1983). Another court summarily found no cause of action, *Doe v. McFaul,* 599 F.Supp. 1421, 1430 (S.D.Ohio 1984). Because of the brevity of the analysis in each of these decisions, this is akin to a case of first impression.

2. 1980 and 1984 amendments produced the following proviso:

   Failure to achieve compliance with the requirement of subsection (a)(12)(A) of this sec-

tion within the three-year time limitation shall terminate any state's eligibility for funding under this subpart unless the Administrator determines the state is in substantial compliance with the requirement, through achievement of deinstitutionalization of not less than seventy-five percentum of such juveniles or through removal of one hundred percent of such juveniles from secure correctional facilities, and has made, through appropriate executive or legislative action, an unequivocal commitment to achieving full compliance within a reasonable time not exceeding two years. Section 5633(c).

ther," Congress added subsection (a)(14) in 1980. H.Rep. No. 946, 96th Cong., 2d Sess. 24 (1980), U.S.Code Cong. & Admin.News 1980, pp. 6098, 6111. As amended in 1984, it states that a plan must "provide that, beginning after the five-year period following December 8, 1980, no juvenile shall be detained or confined in any jail or lockup for adults, except that the Administrator shall, through 1989, promulgate regulations which make exceptions with regard to the detention of juveniles accused of non-status offenses who are awaiting an initial court appearance pursuant to an enforceable State law requiring such appearances within 24 hours after being taken into custody (excluding weekends and holidays) provided that such exceptions are limited to areas which—(i) are outside a Standard Metropolitan Statistical Area, (ii) have no existing acceptable alternative placement available, and (iii) are in compliance with the provisions of paragraph 13.[3] (Hereinafter "subsection 14").

Claiming that Webster County fails to comply with each of these requirements and that the state is not substantially complying with subsections 12 and 14, the plaintiffs seek declaratory, compensatory and equitable relief under § 5633 alone and in combination with § 1983.[4]

## I. PRELIMINARY ISSUES

As the plaintiff class is presently certified, its members have been or will be placed in the Webster County Jail by a juvenile court. The county defendants argue that the plaintiffs' § 1983 claims are precluded under the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) because they could raise these issues in juvenile court.[5] This argument can only pertain to those plaintiffs who have already been placed in the jail, because with the exception of those now in jail, the plaintiffs who would be protected by the injunction have not had their day in court.

■■ The Court finds that neither issue nor claim preclusion can bar the claims of the previously jailed plaintiffs. Issue preclusion is unavailable because the defendants have produced no evidence that these issues were actually litigated or necessarily decided in any juvenile court proceedings. *Ideal Mutual Insurance Co. v. Winker,* 319 N.W.2d 289, 296 (Iowa 1982). Iowa law governs the claim preclusive effect of an Iowa juvenile court's judgment, and the Court cannot find an Iowa case in which claim preclusion was successfully asserted against a civil plaintiff because he was a defendant in a prior criminal case, let alone a juvenile court defendant. The *Restatement (Second) of Judgments* does not give prior criminal judgments a claim preclusive effect. *See id.* at § 85 comment (a) (1980). Although a § 1983 plaintiff can be precluded from raising issues which she could have raised in a prior civil action which she initiated, *Migra v. Warren City District Board of Education,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), a footnote in

---

**3.** The 1980 amendment contained a "substantial compliance" provision for subsection 14 which is very similar to the (12)(A) provision quoted in note 2, *supra.* As amended in 1984, it permits the state to retain eligibility after the December 5, 1985 deadline for compliance if the Administrator determines the state has achieved 75% removal and the state has made an unequivocal commitment to achieving compliance by 1988. Section 5633(c).

**4.** Because the Court finds that a cause of action is available under § 1983 to protect rights created by § 5633, the Court need not decide whether § 5633 itself gives rise to an implied cause of action.

**5.** The county defendants have raised a related claim that the Court must defer to the state juvenile courts under *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), or *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970). However, a federal court may not use *Pullman* abstention to avoid a purely statutory question, and the *Younger* doctrine is really a form of the irreparable injury requirement. Because the Court finds, *infra,* that the plaintiffs commonly suffer an irreparable injury prior to juvenile court proceedings, the Court cannot defer under *Younger.*

*Migra* suggested that former state court *defendants* should be treated differently because they do not voluntarily go to state court first. *Id.* at 85 n. 7, 104 S.Ct. at 898 n. 7. In a very important case, the Second Circuit recently held that *Migra* does not apply to federal plaintiffs who were the defendants in a prior state court action. *Texaco v. Pennzoil,* 784 F.2d 1133, 1144 (2d Cir.1986), *reversed on other grounds,* —— U.S. ——, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). In light of this authority, the Court finds that an Iowa court would not give a juvenile judge's placement decision a claim preclusive effect. The county defendant's motion to dismiss on this ground is denied.

■ The defendants assert that the plaintiffs must first file a complaint with the OJJDP, as permitted in 28 C.F.R. § 18.5(j) (1986).[6] They contend that § 18.5(j) is a remedy which must be exhausted and that only the OJJDP has primary jurisdiction to decide whether states have complied with § 5633. If the plaintiffs can proceed under § 1983, no exhaustion requirement applies. *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The doctrine of primary jurisdiction [7] presumes that the plaintiffs can "get relief" administratively, *see Rosado v. Wyman,* 397 U.S. 397, 406 n. 8, 90 S.Ct. 1207, 1214 n. 8, 25 L.Ed.2d 442 (1970); *Chowdhury v. Reading Hospital and Medical Center,* 677 F.2d 317, 320 (3d Cir.1982). However, the most important form of relief the plaintiffs seek—an order *requiring* compliance—is not available

from the OJJDP. *See* § 18.5(a). The OJJDP can only cut off funding. The doctrine of primary jurisdiction therefore does not bar the plaintiffs' claim.[8]

In briefs filed prior to subsection 14's compliance deadline of December 5, 1985, the defendants argued that plaintiffs' claim under that subsection was not ripe. Following that date, they argued that the claim was not ripe because the Administrator had not yet decided whether the defendants had complied or substantially complied. To the extent that this argument implies that only the OJJDP has jurisdiction to decide whether the defendants satisfy § 5633, the argument merely restates their primary jurisdiction argument which the Court has already rejected. Ripeness depends upon whether the plaintiffs' injuries have occurred or are about to occur, not whether the illegality of that injury has already been established. That question is properly before the Court at this time.

■ The county defendants have argued that Fed.R.Civ.P. 17 requires a plaintiff class of minors to proceed through a guardian ad litem and have asked the Court to appoint one. Plaintiffs' counsel respond that one of them can represent the class as "next friend". Under standards set out in *Child v. Beame,* 412 F.Supp. 593, 599 (S.D. N.Y.1976), the Court concludes that the class can be adequately represented by the plaintiffs' counsel, so that a guardian ad litem need not be appointed at this time.

---

6. Section 18.5(j) states:
    Any person may request the responsible agency official to determine whether a grantee has failed to comply with the terms or the statute under which the grant was awarded, agency regulations or the terms and conditions of the grant. The responsible agency may, in its discretion, conduct an investigation into the matter and, if warranted, make a determination of noncompliance. Only a grantee determined to be in noncompliance may request a compliance hearing.

7. In arguing that the OJJDP has primary jurisdiction, the county defendants rely in part upon deposition testimony from former OJJDP Administrator Alfred Regnery that he "would argue" that the plaintiffs must first use § 18.5(j). Although courts can sometimes defer to allow a non-judicial resolution of a legal question, the

separate question of whether the Court *can* defer is for the Court alone to decide. *Cf. AT & T Technologies, Inc. v. Communication Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986).

8. The Court also believes the OJJDP lacks primary jurisdiction to determine the defendants' compliance with the JJDPA because the issue does not involve "technical questions of fact uniquely within the expertise and experience of an agency." *Nader v. Allegheny Airlines,* 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976). The task of applying law to fact is not unusually complex, the standards require little interpretation, and the Court can rely upon the same fact-gathering system of performance reports upon which the OJJDP would rely.

■ Finally, the Court must decide whether the plaintiffs' JJDPA claim must be dismissed for failure to name an indispensable party. The county defendants argue that the plaintiffs must sue the juvenile judges who order the sheriff to place class members in jail, and that their failure to do so warrants dismissal under Rule 12(b)(7). The Eighth Circuit's decision in *R.W.T. v. Dalton*, 712 F.2d 1225, 1233 (8th Cir.1983), indicates that juvenile judges are not indispensable parties to actions of this sort. The motion is therefore denied.

## II. THE PLAINTIFFS' § 1983 CAUSE OF ACTION FOR RIGHTS CREATED BY § 5633

Prior to 1980, citizens could only enforce federal statutory rights if a cause of action was expressly provided for in the statute or if one could be implied under general principles stated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Under these principles, a cause of action could only be implied if the plaintiff was one of the class for whose especial benefit the statute was enacted, a congressional intent to create a remedy could be found, such a remedy would be consistent with legislative purposes, and it would not inappropriately interfere with a traditionally state area. *Id.* In effect, these requirements placed the burden on the plaintiff to find a specific intent to permit this particular form of a remedy.

Since 1874, § 1983 has expressly provided a private cause of action for claims arising from "the deprivation of any rights, privileges or immunities secured by the Constitution *and laws*" by individuals acting under color of state law. Until *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the "and laws" phrase was generally ignored. In *Thiboutot*, the court formally recognized that § 1983 provided a private cause of action for "claims based on purely statutory violations of federal law" by state actors. Now plaintiffs

suing state actors who cannot satisfy *Cort v. Ash* by showing that the same Congress which created a statutory right also intended to give them a civil remedy may rely upon the general purpose of § 1983—"to provide a remedy, to be broadly construed, against all forms of official violations of federally protected rights." *Monell v. New York City Department of Social Services,* 436 U.S. 658, 700–701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978).

■ Two requirements persist. A separate federal statute must create enforceable rights, privileges or immunities, *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (hereinafter "*Pennhurst I*"), and Congress must not have specifically foreclosed the § 1983 remedy, *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).

### A. Does § 5633 Create Enforceable Rights?

■ The easy part of answering this question is deciding where to look; "the key to the inquiry is the intent of the legislature." *See Clammers Association,* 453 U.S. at 13, 101 S.Ct. at 2622; *Hill v. Group Three Housing Development Corp.,* 799 F.2d 385, 394 n. 10 (8th Cir. 1986). The difficult part is deciding what reflects an intent to create a right. As usual, Congress "has voiced its wishes in muted strains and left it to the courts to discern the theme" indirectly. *Rosado v. Wyman,* 390 U.S. at 412, 90 S.Ct. at 1218. If the Court were to define the term "right" so narrowly that no right would exist unless the Court could find an intent to permit a private suit, nothing would be left of *Thiboutot.*[9] On the other hand, the purpose behind the quiet inclusion in § 1983 of the phrase "and laws" is too uncertain to permit that statute to give rise

---

**9.** For this reason, the Court must reject the urge to analogize § 1983 rights to the rights of third-party beneficiaries in contract law, because in most states third-party beneficiary rights exist only where both contracting parties intended to create a remedy enforceable in court by third parties. *Martinez v. Socoma Companies, Inc.,* 11 Cal.3d 394, 113 Cal.Rptr. 585, 521 P.2d 841 (1974); *Restatement (Second) of Contracts* §§ 304 and 313.

to a remedy against any state official who has violated any federal law. *See Consolidated Freightways Corp. v. Kassel,* 730 F.2d 1139 (8th Cir.1984); *First National Bank of Omaha v. Marquette National Bank,* 636 F.2d 195, 198–99 (8th Cir.1980).

A right was easily found in *Thiboutot* because the case involved an entitlement program. The existence of a right was easily rejected in *Pennhurst I,* when plaintiffs sought to enforce a provision labeled as a bill of rights for persons with developmental disabilities, but which created no separate obligation upon those states receiving funds under the law to respect those rights. The Supreme Court found that because the law "does no more than express a congressional preference for certain kinds of treatment," the "rights" described were not rights enforceable under § 1983. 451 U.S. at 19, 101 S.Ct. at 1541.

However, in so finding, the court emphasized that the language in question was too informal to even condition the state's eligibility for funding upon compliance therewith. *Id.* at 13, 19, 20 n. 15, 21–22, 101 S.Ct. at 1537, 1540, 1541 n. 14, 1542. For that reason, it did not fully consider the Solicitor General's position that a § 1983 right would exist if the law created conditions upon the state's eligibility for grants. *Id.* at 22, 101 S.Ct. at 1542.

The Supreme Court recently decided a case presenting that issue. In *Wright v. Roanoke Redevelopment and Housing Authority,* — U.S. —, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), tenants in federally subsidized low-income housing sued their public housing authority, alleging that it overbilled them for their utilities and thereby violated a federal rent ceiling. The ceiling was an express funding condition; if a housing authority violated the standard, the agency could have cut off funds. *Id.* at —, 107 S.Ct. at 773. The Fourth Circuit Court of Appeals had ruled that the rent ceiling did not create § 1983 rights because it was "highly unlikely that Congress intended federal courts to make the necessary computations regarding utility allowances that would be required to adjudicate individual claims of right." 771 F.2d 833, 836–37 (4th Cir.1985). The Fourth Circuit had also reasoned that "the existence of such a right is essentially negatived by the provisions of the annual contributions contract" between the defendants and HUD permitting HUD to sue local authorities which violated the ceiling. *Id.* at 837–38 n. 9.

The Supreme Court reversed the Fourth Circuit, finding "little substance" to the claim that the amendment created no rights. The Supreme Court merely noted that the utility rule was a "mandatory" limitation, and that "the intent to benefit tenants is undeniable." — U.S. at —, 107 S.Ct. at 774.

The reasoning of the Fourth Circuit in that case and the defendants in this case—that an agency's right to cut off funds forecloses recognition of a § 1983 right of beneficiaries—is inconsistent with the Supreme Court's decision in *Wright.* Furthermore, the Supreme Court did not decide this issue as the Fourth Circuit had and the defendants would, by asking whether Congress would have intended federal courts to decide whether the obligations were violated; it merely looked to the mandatory nature of the defendant's obligation and the clarity of the intent to benefit the tenants.

The Court finds that the same indices of an intent to create a right are present in this case. In enacting subsections 12 through 14, Congress clearly intended to confer a special benefit upon a distinct class—detained juveniles.[10] The county defendants would characterize the subsections as an attempt to solve a societal problem, and the Court does not necessarily

10. The House Report accompanying the 1980 amendment which added subsection (14) stated:
 Witnesses during the hearing pointed to potential physical and sexual abuse encountered by juveniles incarcerated in adult jails. It was pointed out that in 1978, the suicide rate for juveniles incarcerated in adult jails was approximately seven times the rate of children held in secure juvenile detention facilities. One Department of Justice official termed this a "national catastrophe." H.Rep. No. 946 at 24, U.S.Code Cong. & Admin.News 1980 at 6111.

disagree. But if the public at large also benefits from these requirements, it is only because juveniles benefit. *Compare California v. Sierra Club,* 451 U.S. 287, 295, 101 S.Ct. 1775, 1780, 68 L.Ed.2d 101 (1981).

This conclusion is supported by the phrasing of subsection 14, a factor which the Supreme Court has considered important in other cases. In *Universities Research Association v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981), the court held that no private cause of action would be implied from § 1 of the Davis–Bacon Act in part because it was "simply phrased as a directive to federal agencies engaged in the disbursement of funds," and was not drafted with an unmistakable focus on a benefited class. *Id.* The case the *Coutu* court sought to distinguish, *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), involved a statute phrased much like subdivision 14's ("no juvenile shall be detained ...") requirement.[11] In *Cannon,* the court found an unmistakable focus on a benefited class from the phrasing of Title IX, 20 U.S.C. § 1681, which provides that "no person in the United States shall, on the basis of sex ... be subject to discrimination under any educational program or activity receiving federal financial assistance." [12]

Furthermore, unlike the preferences in *Pennhurst I* but like the utility regulations in *Wright,* subsections 12 through 14 create mandatory funding eligibility conditions to which states such as Iowa subject themselves by receiving JJDPA funds. If Iowa has not satisfied the mandates, either through full compliance or substantial compliance and an unequivocal commitment to comply, the state loses its eligibility. Section 5633(c). For this reason, the subsections are not simply a "nudge in a preferred direction," as the defendants argue.

It is also very significant that these subsections are more than funding conditions; they have given rise to duties. In order to receive funds, the state has been required to describe its plans, procedures and timetables for "assuring" that the requirements of subsections 12 through 14 have been met or would be met by the proper deadline. 28 C.F.R. §§ 31.303(c)(1), 31.303(d)(i) and 31.303(e)(1) (1986). This language of "assurance" leaves little doubt that by receiving funds, the state has assumed responsibility for seeing that the eligibility conditions would occur.[13]

The state defendants have argued that the mandates of subsections 12 and 14 are too generalized to give rise to an individual right because substantial compliance provisions permit the state to temporarily comply while only reducing jailing of juveniles and status offenders by 75%. This is an attractive argument, but the Eighth Circuit Court of Appeals has impliedly rejected a similar theory. In *Crawford v. Janklow,* 710 F.2d 1321 (8th Cir.1983), the plaintiffs were low-income persons who had been excluded from eligibility for assistance under South Dakota's implementation plan for the Low Income Home Energy Assistance Act. The court recognized that the responsible federal agency could only enforce the grant conditions by withholding funds, and that this could only be done in cases of

---

**11.** Of course, subsection 14 has an exception. But as Fourth Amendment caselaw shows, rights can have many exceptions and still be considered "rights."

**12.** As a test for the existence of a right, this semantic distinction has its limitations. *See, e.g.,* U.S. Const. Amend. 1 (Congress shall make no law....). Thus, the fact that subsections 12 and 13 are not phrased like Title IX is not enough reason to find that they do not create rights, when juveniles are the primary beneficiaries of their enactment.

**13.** For reasons best stated by Judge Cardozo, the Court finds a duty without asking whether Iowa

formally promised to comply with these requirements:

> The law has outgrown its primitive stage of formalism where the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking but yet the whole writing may be "instinct with an obligation", imperfectly expressed.

*Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (N.Y.1917). As administered by the OJJDP, § 5633 is instinct with an obligation by any reasonable reading of the statute and its regulations.

substantial noncompliance. *Id.* at 1325, 1326, *citing* 42 U.S.C. § 8626(a)(1) (1982). Nevertheless, the court viewed this provision as another reason to recognize a cause of action, as a sign that "such a private remedy is virtually a necessity to complete the legislative scheme of effective and efficient distribution of benefits." *Id.* at 1325. Furthermore, the substantial compliance exception to subsection 14 is not presently available to Iowa because it has not demonstrated an unequivocal commitment through legislative or executive action to achieving full compliance by 1988.

After looking at § 5633 for the factors which the Supreme Court and the Eighth Circuit have considered as reflective of an intent to create a right, the Court finds that subsections 12 through 14 create enforceable rights.

B. Have the Defendants Demonstrated that Congress Has Foreclosed Enforcement of These Rights in a § 1983 Action?

■ Once the plaintiffs demonstrate that the statute creates enforceable rights, the burden shifts to the defendants to demonstrate that Congress intended to foreclose their enforcement through § 1983. *Wright* at —, 107 S.Ct. at 771. This burden is particularly heavy because the Supreme Court has limited the sources from which such an intent may be inferred to "an express provision [14] or other specific evidence in the statute itself." *Id.* Even if the statute provides its own remedial mechanism, it must be "sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a § 1983 cause of action." *Id.*

The defendants have argued that the OJJDP's power to terminate funding is a sufficiently comprehensive remedy for violations of any rights created by § 5633. However, the Court cannot confuse remedies with mere sanctions. If the OJJDP cuts off funding for Iowa's failure to live up to its obligations, none of the juveniles whose rights were violated by improper placement in jails will be helped in the least bit. Because the power to cut off funds is "woefully inadequate as to persons in dire need" of the statute's benefits, *Crawford*, 710 F.2d at 1326, it cannot be termed a remedy in the proper sense of that term. *Cf. Wright*, — U.S. at —, 107 S.Ct. at 773; *Cannon*, 441 U.S. at 704–05, 99 S.Ct. at 1961–62; *Rosado*, 397 U.S. at 420, 90 S.Ct. at 1221.

The remaining arguments of the defendants involving the statute itself presume that its provisions must be read exclusively. Under this theory, provisions showing a congressional intent to assist states constitute evidence of an intent to only assist, and provisions showing a congressional intent to cut off funds from non-complying states show an intent to only cut off funds. However, the Supreme Court has discouraged this type of " 'excursion into extrapolation of legislative intent', *Cort v. Ash*, 422 U.S. at 83 n. 14 [95 S.Ct. at 2090 n. 14], unless there is other, more convincing, evidence that Congress meant to exclude the remedy." *Cannon*, 441 U.S. at 711, 99 S.Ct. at 1965.

Having failed to satisfy the tests in *Wright*, the county defendants attempt to distinguish *Wright* on its facts. In *Wright*, the Supreme Court noted that a comment section accompanying relevant regulations indicated that the responsible agency believed that a private cause of action was not foreclosed. In this case, former Administrator Regnery of the OJJDP made statements in a deposition which the county defendants believe show an opposite belief.

The Court recognizes that "some deference" is often due to agency interpretations of the laws they are charged with applying. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). But in deciding pure questions of law, the Court is reluctant to give equal respect to responses in a deposition given by a single administrator and the more formal agency statements involved in

---

**14.** The defendants do not argue that an express provision in the JJDPA forecloses private enforcement.

*Wright.*[15] Furthermore, Regnery's testimony shows that he never addressed the question now before the Court—whether the statute shows that Congress wished to foreclose enforcement through § 1983. His most meaningful deposition testimony merely shows that he would require the plaintiffs to exhaust the procedures provided by 28 C.F.R. § 18. (Deposition of Alfred Regnery at 125).[16]

The defendants also contend that the failure of two bills which would have given juveniles an express cause of action to prevent the jailing of status offenders and the placement of juveniles in adult jails indicates that Congress intended to foreclose a § 1983 action to enforce similar rights created by the JJDPA and its amendments. S. 520 and S. 522, 98th Cong., 1st Sess. (1983). While this is not evidence "from the statute itself," as *Wright* requires, it is relevant under separate principles described in *Heckler v. Day*, 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984). In *Day*, a federal court improperly granted a form of class-wide injunctive relief for agency violations of law after Congress had specifically considered, rejected and criticized that particular form of relief. The court noted that "our decision in this case is limited to the question of whether, in view of the *unequivocally clear intent of Congress to the contrary*, it is nevertheless appropriate for a federal court" to enter such relief. *Id.* at 104 n. 33, 104 S.Ct. at 2257 n. 33 (emphasis added).

The failure of these bills to progress does not show "the unequivocally clear intent of Congress" to foreclose a private cause of action to enforce the JJDPA. Unlike the JJDPA, these bills would have banned jailing practices in every state, regardless of whether the state accepted JJDPA funds. Furthermore, the text of each bill included an unqualified declaration that the jailing of status offenders and the placement of juveniles in adult jails is unconstitutional. As the hearing record shows, these provisions were more controversial than the private cause of action provisions. *Public Welfare of Juveniles, supra* at 1–36. Thus, the Court cannot attribute the failure of these bills to any particular section contained therein.

For the reasons stated above, the Court finds that Congress did not foreclose a § 1983 remedy, and such a remedy is therefore available.

## III. ARE THE PLAINTIFFS ENTITLED TO A PRELIMINARY INJUNCTION?

■ The plaintiffs seek an order which would (1) forbid the defendants from permitting certain jailing practices, (2) prohibit the defendants from receiving or spending OJJDP funds until compliance with the JJDPA is achieved, and (3) require the State to pay back funds already received from the OJJDP if compliance is not achieved. Because the plaintiffs have failed to demonstrate that they have standing or a cause of action to seek the second or third types of relief, that part of their motion must be denied. *See Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).[17]

---

**15.** The marginal value of Mr. Regnery's deposition testimony is apparent from one of the excerpts upon which the county defendants rely most heavily:

Q. You don't think [juveniles are] third-party beneficiaries to an arrangement between the Government and the state?

A. I suppose the citizens of the state, all of the citizens. I'm not sure any of them have any better rights than any others. But I really don't know the answer to the question. (Deposition of Alfred Regnery at 72).

**16.** The county defendants also rely on Mr. Regnery's testimony before a Senate committee in opposition to S. 520 and S. 522. Upon review of this testimony, it is again apparent that Mr. Regnery did not address the question of whether the Congresses which passed the JJDPA and its amendments intended to foreclose a remedy. At most, it shows his own general hostility to civil rights suits and his belief that the JJDPA "is still working." *Public Welfare of Juveniles: Hearing Before the Subcommittee on the Constitution of the Senate Judiciary Committee,* 98th Cong., 2d Sess. 15 (1984).

**17.** The state defendants' motion for summary judgment is granted insofar as it challenges these two types of relief although the Court does not reach the Eleventh Amendment issues raised by the state in opposition to this relief.

The plaintiffs seek to restrain three jailing practices as violative of the JJDPA and the Constitution, and have moved to restrain two other practices which they contend are prohibited by state law. However, they have not amended their complaints to state any state law claims, and even under liberal notice pleading rules, the Court cannot read state law claims into the plaintiffs' pleadings.[18] Thus, the only relief the Court can properly consider granting at this time is a preliminary injunction order requiring the defendants to comply with the Constitution or federal law. The Court must consider the statutory claims first.

Whether a preliminary injunction should issue involves consideration of

1. The threat of irreparable harm to the movant;
2. The state of the balance between this harm and the injury that granting the injunction will inflict upon the other parties litigant;
3. The probability that the movant will succeed on the merits; and
4. The public interest.

*Dataphase Systems, Inc. v. C.L. Systems,* 640 F.2d 109, 113 (8th Cir.1981).

1. Probability of Success on the Merits.

The plaintiffs have already demonstrated that subsections 12–14 of § 5633 create rights enforceable under § 1983. The critical question is whether the plaintiffs are likely to show that the defendants are violating each of those rights. For the reasons below, the Court finds that the plaintiffs are unlikely to show violations of subsections 12 and 13, but are very likely to prove that subsection 14 is being violated.

Neither Congress nor the OJJDP have demanded perfect compliance with plan requirements by states receiving funds under the JJDPA.[19] Thus, the OJJDP has created provisions which excuse minor failures to comply with subsections 12 through 14, *see* 46 Fed.Reg. 2566 (Jan. 9, 1981) (policy and criteria for de minimis exceptions to subsection (a)(12)(A)) and 28 C.F.R. § 31.303(f)(6)(ii) and (iii) (1986) (regulations creating de minimis exceptions to subsections 13 and 14). Thus, if a state's failure to comply is considered de minimis under these regulations, the state is technically not out of compliance.[20]

The state's failure to completely satisfy subsection 12 by deinstitutionalizing all status offenders must be considered a de minimis failure. Under the 1981 de minimis regulations, the state must report the number of accused status offenders and nonoffenders held in secure detention facilities or secure correctional facilities in excess of 24 hours and the number of adjudicated status offenders and nonoffenders held in such facilities; if the sum is less that 5.8 persons for every 100,000 juveniles in Iowa (or 47.9 [21]), the failure is de minimis. 46 Fed.Reg. at 2567. The most recent monitoring report indicates that only 23 status offenders and nonoffenders were jailed in Iowa during the last reporting period for the requisite length of time

---

**18.** The only references to state law in the Second Amended Complaint are an assertion that the Court has pendent jurisdiction over the plaintiffs' state law claims and a statement that the plaintiffs have rights under state and federal contract law. Because these conclusory statements fail to provide notice to the defendants of what the plaintiffs' state claims would be, the plaintiffs have failed to satisfy Fed.R.Civ.P. 8. *Rotolo v. Borough of Charleroi,* 532 F.2d 920, 922–23 (3d Cir.1976).

**19.** The House Committee Report accompanying the 1980 amendment states that "the committee expects a 'rule of reason' to be followed in the implementation of § 223(a)(14)." H.Rep. 946 at 26, 1980 U.S.Cong. & Admin.News 1980 at 6113.

**20.** The de minimis exceptions should not be confused with the substantial compliance provisions of § 5633(c). The de minimis exceptions excuse minor deviations from full compliance once the statute requires full compliance, and the substantial compliance provisions permit a state to delay compliance with de minimis deviations by demonstrating substantial progress toward achieving full compliance, as demonstrated by a 75% reduction and an unequivocal commitment through executive or legislative action toward achieving full compliance by 1988. There are no de minimis exceptions to the substantial compliance provisions.

**21.** There were 825,573 juveniles in Iowa in 1980 according to the most recent census. (State Monitoring Report for 1986 at 4).

(State Monitoring Report at 4). This is well within the regulations. Thus, the plaintiffs are not entitled to an order compelling compliance with subsection 12.

▮ The state's failure to achieve complete separation of juveniles and adult offenders under subsection 13 also appears to be a de minimis failure. While the state report indicates that 50 juveniles were incarcerated in circumstances that would be violative of subsection 13, that constitutes a de minimis failure if Iowa law clearly prohibited each instance, such instances were isolated, and existing state mechanisms make repetition unlikely. 28 C.F.R. § 31.303(f)(6)(ii)(B). Iowa was found to have satisfied these requirements in 1984 (Exhibit A), and the plaintiffs have not shown that the state would fail to meet these requirements this year. For these reasons, the plaintiffs' request for an order requiring compliance with subsection 13 must be denied.

▮ The jail removal mandate of subsection 14 is a different story. The state has all but conceded that it has not either substantially complied or fully complied with this provision. (Transcript of Oral Arguments at 30).[22] Using the state's own data in a formula for analyzing it which puts the state in the most favorable light,[23] the Court finds that the state has achieved no better than a 44% reduction in the jailing of juveniles. Moreover, there is every indication that the jailing of juveniles will continue at an impermissibly high rate. For these reasons, the plaintiffs have shown a very high probability of success on the merits of their claim that the defendants have violated subsection 14 and will violate it in the future.

### 2. Irreparable Injury.

The plaintiffs must also show that without an injunction, they will suffer an immediate and irreparable injury. *Fenner v. Boykin*, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926). A deprivation of the plaintiffs' rights not to be placed in an adult jail or lockup would fulfill the injury requirement, *Henry v. Greenville Airport Commission*, 284 F.2d 631, 633 (4th Cir. 1960), and without an order, those who become class members would by the nature of their membership in the class suffer this injury. In light of the number of such placements during the previous reporting period, the Court finds that the threat of future placement of class members in adult jails or lockups is sufficiently immediate to ripen the plaintiffs' claim and to satisfy the immediacy requirement. *See Kolender v. Lawson*, 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983). Because placement in jail often precedes the only formal adjudication at which their right not to be placed there could conceivably be asserted, *see* Iowa Code § 232.22(4), the injury will commonly occur before any remedy at law is available. *Compare Trucke v. Erlemeier*, 657 F.Supp. 1382 (N.D.Iowa 1987). Therefore, the irreparability requirement has been satisfied. *Gerstein v. Pugh*, 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 860 n. 9, 43 L.Ed.2d 54 (1975); *R.W.T. v. Dalton*, 712 F.2d 1225, 1234 (8th Cir.1983).

### 3. Balancing the Hardships and the Public Interest.

Each party vigorously argues that the balancing of hardships and the public interest tip in their favor. The county defendants argue that the injury to the plaintiffs which would occur through placement in

---

**22.** In 1984 Congress created an exception to subsection 14, so that in theory the state might satisfy this subsection if every juvenile placed in Iowa jails beyond the de minimis level fit within this exception. However, that exception does not apply to juveniles jailed in Iowa's eight largest metropolitan areas, and the testimony of Tim Buzzell indicates that the number of juvenile jailings in Iowa's metropolitan areas alone might place the state out of compliance with subsection 14.

**23.** Where x equals the total number of juvenile-type offenders held in adult jails and lockups and y equals the total number of accused and adjudicated status offenders and nonoffenders held in adult jails and lockups: [x for 1980 (or 4031) plus y for 1977 (or 2159)] minus [x for 1986 (or 3232) plus y for 1986 (or 230)] equals a reduction of 2728, or 44%.

adult jail or lockup is too small to outweigh the "compelling interest of the state of Iowa in protecting Iowa citizens from the crimes which might be committed upon it by juvenile perpetrators." The plaintiffs argue that the jailing of juveniles merely serves the convenience of judges and law officers. They contend that the defendants cannot rely upon the objective of protecting society because their own statistics indicate that the majority of juvenile jailings only last for twelve hours or less, and conclude that even with a "wholesale release of all juveniles, there is simply no risk of harm or injury to any other parties litigant."

The Court must evaluate the hardships and the public interest by reference to some set of values and priorities. However, the Supreme Court has consistently held that when balancing the hardships of enforcing federal law, a court cannot substitute its own values for the discernible values of Congress. "When Congress itself has struck the balance, and has defined the weight to be given the competing interests, a court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 609–10, 72 S.Ct. 863, 897, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). As the Supreme Court noted in affirming a district court which enforced a federal law protecting the snail darter as an endangered species by enjoining the completion of a dam, "once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the executive to administer the laws and for the courts to enforce them when enforcement is sought." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

Whether this Court likes it or not, Congress has consistently valued the removal of juveniles from adult jails over the administrative, protective and penological advantages of placing them there. It makes little difference at this stage that these values were embodied in a funding program rather than a nationwide prohibition. If the state did not share Congress' priorities or did not wish to implement them, it could have merely refused to seek OJJDP funding.

The greatest difficulty arises from the fact that the state and its subdivisions have failed to build an adequate "safety net" of juvenile detention centers and foster homes which might lessen the immediate risk to society of compliance with the jail removal mandate. Hearing testimony indicated that while many counties have risen to the occasion by constructing juvenile detention centers of sufficient size to absorb the effects of jail removal, the facilities in many of Iowa's most populous counties can only accommodate a small fraction of the juveniles incarcerated in that county's jails. (Testimony of Tim Buzzell at 51–54). Thus, the Court must acknowledge that if it enters the order requested, in the short run juvenile authorities will probably release more accused and adjudged juvenile offenders back into society, and those authorities may send away to reformatories a greater number of the most dangerous delinquents who would have been kept closer to their families in county jails. However, the Court has no legitimate basis to conclude that Congress would find this result so objectionable that it would prefer to have the Court tolerate the regular deprivation of congressionally created rights.

Furthermore, it would be a mistake to view this issue as a choice between protecting criminals and protecting society from crime. Many supporters of the JJDPA and the jail removal mandate believe that placing juveniles in adult jails fosters more serious criminal conduct. Senator Arlen Specter—no coddler of criminals—stated that "the consequence of mixing juveniles and adults is simply to teach juveniles how to commit more crimes. They are training schools, and I have seen that again and again and again with the experience I have had as a prosecuting attorney." *Public Welfare of Juveniles: Hearing Before the Subcommittee on the Constitution of the Senate Judiciary Committee*, 98th Cong., 2d Sess. 10 (1984).

The defendants have argued that a compliance order would effectively compel the state and its subdivisions to spend hun-

dreds of thousands of tax dollars to build separate juvenile facilities. It is significant for Eleventh Amendment purposes that the plaintiffs have not asked the Court to order such expenditures; they have asked the Court to enjoin the defendants from violating federally created rights. However likely it is that those officials would react to such an order by spending tax money, that discretion "rests entirely with the state, its agencies, [its subdivisions,] and legislature, not with the federal court." *Quern v. Jordan,* 440 U.S. 332, 348, 99 S.Ct. 1139, 1149, 59 L.Ed.2d 358 (1979). In considering this cost as a legitimate hardship to be balanced, the Court must remember that if jail removal was politically and economically cheap, the need for congressional action might never have arisen. For this reason, such costs must be kept in perspective.

The Court finds that the balance of hardships, as evaluated with congressional priorities in mind, tips in favor of the plaintiffs, and that the public interest, as defined by Congress, would be served by some type of compliance order. The Court must now decide what type of order shall issue.

## IV. TAILORING THE REMEDY

Before the Court can decide what kind of order should issue, it must decide whether it has the authority to bind each defendant plaintiffs have named. The greatest limitation on that authority is § 1983 itself. As the Supreme Court held in *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1975), "the plain words of the statute impose liability—whether in the form of payment of redressive damages or being placed under an injunction—only for conduct which 'subjects, or causes to be subjected' the complainant to the deprivation of a right secured by the Constitution and laws." *Rizzo* requires a link between the affirmative conduct of liable defendants and the deprivation of the plaintiffs' rights. *Id.* at 377, 96 S.Ct. at 607.

The Court has the authority to bind Sheriff Griggs because the placement of juveniles in the Webster County Jail is the relevant deprivation, and he is involved, however involuntarily, in the task of placing juveniles in the jail. *See* Iowa Code § 256.2. It makes no difference that the Sheriff has played no role in Iowa's participation in the JJDPA program; that participation merely gave rise to the plaintiffs' rights, and those rights can be deprived by individuals with no connection to the program.[24]

While the state defendants' connection to each deprivation is less direct, the logic of the Eighth Circuit's decision in *Messimer v. Lockhart,* 702 F.2d 729 (8th Cir.1983), leads the Court to conclude that they may be bound.[25] In *Messimer,* a prisoner sued the director of a State Department of Corrections, complaining of administrative decisions made by his subordinates at one of the state's prisons. Even though the director could not be liable for their actions under the common law doctrine of respondeat superior, the court found the "affirmative link" required by *Rizzo:*

> The plaintiffs are not complaining about isolated instances of alleged mistreatment; they are complaining about policy decisions made by those in charge of the prison. Lockhart has a statutory duty to administer the Department of Correc-

---

**24.** Contrary to Defendant Griggs' argument that he should not be bound because he would be immune under principles of qualified immunity or derivative judicial immunity, the fact that an official is immune from liability for damages does not preclude injunctive or declaratory relief against him. *Gross v. Tazewell County Jail,* 533 F.Supp. 413, 419 (W.D.Va.1982).

**25.** When the plaintiffs' second amended complaint was filed, Defendant Richard Ramsey was executive director of Iowa's Criminal and Juvenile Justice Planning Agency. At the hearing, Agency Employee Tim Buzzell testified that Mr. Jack Crandall has replaced Defendant Ramsey in that position. Although Defendant Ramsey was sued in both his official and individual capacities, the Court finds no basis to bind him in his individual capacity. Because Mr. Crandall appears to have taken over Defendant Ramsey's official capacities, he will be substituted for Ramsey for purposes of this order under Rule 25(d)(1). Plaintiffs' counsel should notify the Court if they contend Mr. Ramsey should remain a party to this action.

tions and supervise the administration of all institutions, facilities, and services under the Department's jurisdiction. [Statutory citations omitted]. The state conceded at oral argument that Lockhart has the authority to change policies instituted by the warden of the Cummins Unit. Thus, Lockhart may be responsible for his own failure to act.

*Messimer,* 702 F.2d at 732.

In this case, the state defendants did not concede that they have the authority to prevent the jailing of juveniles. It is the state itself which made a policy decision to authorize the jailing of juveniles, *see* Iowa Code § 232.22, and the state defendants have argued that the separation of powers in Iowa government limits the authority of Governor Branstad and Mr. Crandall to unilaterally change the course of county and municipal jailing practices. However, Congress evidently foresaw this problem and took an important step to solve it. Subsection 2 of the JJDPA's state plan requirements requires state plans to "contain satisfactory evidence that the state agency designated in accordance with paragraph 1 ... has or will have the authority, by legislation if necessary, to implement such plan in conformity with this part." § 5633(a)(2). The Court does not know how the state fulfilled this requirement, but it does know that the state has received funds in every year since this provision was enacted. (Exhibit A). The Court infers from this that the state's plan contained assurances of agency authority upon which the OJJDP relied in extending funds. The Court has examined relevant Iowa law and is persuaded that the legislature need

not act before the state defendants or agencies accountable to Defendant Branstad can take meaningful steps to comply with the jail removal mandate. The Iowa Department of Corrections is authorized under Iowa Code § 356.36 to "draw up minimum standards for the regulation of jails ... and municipal holding facilities." [26] While a moratorium was adopted in 1981 which prevented the implementation of enforcement of such administrative rules, that moratorium is to terminate when a "needs assessment of the individual county jails" has been completed, which presumably has occurred in the six years since the moratorium began or can occur by the end of the year. While the most direct solution may be to amend the statute authorizing judges to place juveniles in jail, *see* § 232.22, the Court recognizes that this is only one of several ways to meet the state's federal obligations. Thus, the Court finds that the "authority" element of the *Messimer* logic is satisfied. The Court finds that the state defendants' special duty to use this authority arises from the state's assurances that subsection 14 would be satisfied.[27]

■ The Webster County Board of Supervisors cannot be bound, however. Unlike the state defendants, none of the supervisors appear to have made assurances which would give rise to a duty to keep juveniles out of jail. The only relevant "affirmative conduct" which the Court can attribute to them is their decision well before the December 1985 deadline for compliance to construct a section for juveniles in their jail. This is not sufficient to create

---

**26.** The state defendants object that the Department of Corrections has not been named as a defendant and cannot be named under *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), because it is an agency of the state. The state defendants do not contend that Governor Branstad cannot be named and enjoined in his official capacity, however. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Because the Department of Corrections is accountable to the governor, the Court finds that the plaintiffs' failure to name corrections officials as separate defendants is not a fatal omission. *See* Fed.R.Civ.P. 65(d).

**27.** If actual knowledge that deprivations are occurring is a third prerequisite to the state defendants' liability—*compare Tatum v. Houser,* 642 F.2d 253, 254 (8th Cir.1981), *with Villanueva v. George,* 659 F.2d 851, 854–55 (8th Cir. 1981), the Court finds that the plaintiffs are likely to show that Branstad and Crandall have such knowledge as a result of the December 1986 report. The Court emphasizes that the state defendants are not considered liable simply because they have the authority to prevent known deprivations from occurring. In this case, an additional factor is present—the state's *duty* to prevent them from occurring—which will seldom be present in other § 1983 cases.

the "affirmative link" to each deprivation which *Rizzo* requires. Moreover, they do not appear to be liable in their official capacities under a "official policy or custom" theory because the plaintiffs have not yet demonstrated a county policy to place juveniles in jail after December 1985, and the supervisors do not appear to be the "officials responsible for establishing final policy with respect to the subject matter in question." *Williams v. Butler,* 802 F.2d 296 (8th Cir.1986) (quoting the plurality opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986)). For the same reasons, the Court finds that the county itself cannot be bound.

■ Whether the sheriff and the two state defendants *should* be bound is a different question, and the answer will depend upon the form of relief that the Court deems appropriate. The plaintiffs have asked the Court to forbid "the defendants, their officers, agents, employees, attorneys, successors in office and other persons acting in concert or participation with them from confining plaintiffs and any members of the plaintiff class in any Iowa adult jail or municipal lockups...." For the reasons below, the Court finds that even if this kind of absolute prohibition is authorized by the JJDPA, considerations of equity and comity require the Court to adopt a less intrusive and more flexible approach.

Not every instance of juvenile jailing after December 1985 constitutes a violation of § 5633. A de minimis exception to subsection 14 has been created. *See* 28 C.F.R. § 31.303(f)(6)(iii). Furthermore, if Iowa were to satisfy the substantial compliance provisions of § 5633(c), hundreds of juveniles could be jailed this year without preventing the state from showing the 75% reduction needed to preserve its eligibility for funding.

The state does not presently qualify for either the de minimis exception or the substantial compliance provision. It cannot qualify for the de minimis exception without a "state law, court rule or other statewide executive or judicial policy" which

clearly prohibits detentions in violation of subsection 14, *see* 28 C.F.R. § 31.303(f)(6)(iii)(A)(1); and cannot qualify for the substantial compliance provision without "legislative or executive action" showing an unequivocal commitment to achieving full compliance by 1988. *See* § 5633(c). Thus, a strict interpretation of the JJDPA and its regulations suggests that until these kinds of legal changes are made, the state can only comply by totally complying with the jail removal mandate.

However, federal courts should avoid entering unworkable and excessively intrusive injunctive relief. *O'Shea v. Littleton,* 414 U.S. 488, 500, 94 S.Ct. 669, 678, 38 L.Ed.2d 674 (1974). Under a total compliance order, each juvenile arrest or detention would present an opportunity for contempt. As the inevitable instances of juvenile jailing occur, the Court's docket could fill with requests for emergency relief, and its duty to enforce obedience to its own decrees could degenerate into day-to-day intervention into juvenile justice proceedings. As anything but a last resort, such an order would disturb "the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *City of Los Angeles v. Lyons,* 461 U.S. 95, 112, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983); *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951).

At the same time, the Court is aware that other states have achieved remarkable progress toward full compliance within very short periods of time. Appendix B of the OJJDP's most recent summary of state compliance, which is attached to Exhibit A, compares the number of juveniles held in adult jails and lockups in 1985 with the number reported only one year before. In twelve states, juvenile jailings declined over 75% that year, and in Texas, juvenile jailings declined from 12,353 to 45. This data suggests that Iowa could achieve substantial compliance or full compliance with de minimis exceptions by the end of this year by modeling its policy after any of a number of other states.

The state will be permitted to submit a plan for achieving a combination of policy changes and reductions in the rate of juvenile jailing which would place the state in compliance with the JJDPA by the end of this year. The choice of whether to achieve substantial compliance, compliance with de minimis exceptions, or total compliance will be up to the state. Any particular decision to place a juvenile in jail will not constitute contempt and will not cause the Court to intervene. It will be the primary responsibility of the state defendants and not the Court to reduce juvenile jailings to a legal rate. However, a failure to do so will constitute contempt, and in this respect, the plan the state submits must be fundamentally different from the plans it has submitted to the OJJDP.[28] The plan should be submitted by April 30, 1987.

Whether Defendant Griggs should be bound will depend upon the nature of the plan submitted; if the state defendants present an effective plan which does not rely upon the Court's power to enjoin Griggs, the Court has no reason to do so. For the same reason, the Court will hold the plaintiffs' motion for certification of a defendant class in abeyance pending receipt of the plan. The plaintiffs have moved for recertification of the plaintiff class to include "all juveniles who are currently or will in the future be confined in any county jail or municipal lockup within the state of Iowa." The Court will take this matter up at its next hearing, but the state should prepare its plan under the assumption that the Court will either recertify the plaintiff class as requested, or refuse to recertify it for the sole reason that an expansion of the class would be superfluous, as the county defendants argue.[29]

## CONCLUSION

This Court recognizes that some might contend that it is acting outside of its normal scope of authority in entering this order, or that the order borders on "lawmaking." This Court has carefully weighed this matter and is persuaded that such contentions would be incorrect. While performing its constitutional duty to decide a case which it did not ask to be brought, the Court has found that two congressional enactments—42 U.S.C. §§ 5633 and 1983—combine to give these plaintiffs a remedy to prevent the deprivation of congressionally created rights. If this Court has departed in any degree from the wishes of Congress as expressed in these statutes, it has done so to accommodate the defendants by tempering the statutory remedy.

Accordingly,

IT IS HEREBY ORDERED that the defendants' motions are denied insofar as they involve the following conclusions of the Court:

1) The plaintiffs' § 1983 claims are not barred by res judicata and collateral estoppel.

2) The plaintiffs need not exhaust administrative remedies.

3) The Office of Juvenile Justice and Delinquency Prevention does not have primary jurisdiction over the defendant's statutory § 1983 claim.

4) The plaintiffs' statutory § 1983 claim is ripe for adjudication.

5) The plaintiffs need not proceed through a guardian ad litem.

6) The plaintiffs' JJDPA claim need not be dismissed because a necessary and indispensable party has not been sued.

7) Section 1983 provides a cause of action to seek redress for violations of rights created by § 5633 of the Juvenile Justice and Delinquency Prevention Act.

IT IS FURTHER ORDERED that the state defendants shall submit for the Court's approval a plan for achieving a combination of policy changes and reduc-

---

**28.** As the reapportionment cases adequately demonstrate, it is occasionally necessary for federal courts to issue orders which will require a legislative or quasi-legislative act to insure compliance. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

**29.** Because the county defendants' 12(b)(7) motion was denied and their 12(b)(6) motion was treated as a motion for summary judgment and denied, they should file an answer within fifteen days of the receipt of this order.

tions in the rate of juvenile jailing which would place the state in compliance with the JJDPA by the end of this year. This plan shall be filed by April 30, 1987.

IT IS FURTHER ORDERED that the Court will rule on the remaining grounds for summary judgment, including the defendant's assertions of immunity from damage awards and the cross-motions for summary judgment on the plaintiffs' constitutional claims.

IT IS FURTHER ORDERED that a hearing shall take place soon after the Court receives the state's plan at which the Court will consider the plaintiff's motions for class certification.