Bobby Darnell WHITE, et al., Plaintiffs,

v.

CITY OF RICHMOND, et al., Defendants.

Henry L. ROYAL, et al., Plaintiffs,

v.

CITY OF RICHMOND, et al., Defendants.

Anthony EVANS, et al., Plaintiffs,

v.

CITY OF RICHMOND, et al., Defendants.

Nos. C–79–1184 WHO, C–80–0433 WHO and C–80–4022 WHO.

United States District Court, N.D. California.

Sept. 8, 1982.

■

Rufus L. Cole, John Houston Scott, Cole & Scott, Oliver A. Jones, Regional Counsel NAACP, San Francisco, Cal., for plaintiffs.

Peter P. Edrington, Gibbons, Stoddard & Lepper, Walnut Creek, Cal., for defendants.

## OPINION

ORRICK, District Judge.

Plaintiffs, twenty-seven black residents of the City of Richmond, California, filed these civil rights actions[1] in May, 1979, alleging that Richmond police officers were routinely beating and harassing black Richmond residents and then filing groundless charges, usually resisting arrest or interfering with an officer, against the victims of the beatings; they sought damages and broad injunctive relief.[2] In an effort to settle these cases, the Court suggested that the Community Relations Service of the Department of Justice assist the parties in their efforts to come to an agreement. Over the next eleven months, mediators Edward Howden and Frederick Gray and the parties had twenty-four formal meetings. Proposals for reform and modifications of Richmond police practices and procedures, to be embodied in final consent decrees, were drafted, rejected, revised, and then discussed again. During this time counsel, in addition to their efforts to achieve settlement, were forced simultaneously to prepare their cases for trial, because despite conscientious and well-intentioned efforts on the part of attorneys for both plaintiffs and defendants, settlement was far from assured. In August, 1981, however, the parties were able to reach final agreement on the terms of the decrees, and on September 18, 1981, the Court approved the consent decrees.

■ Counsel for plaintiffs are now before this Court seeking attorneys' fees for their efforts in these cases. The Court has held that plaintiffs were the "prevailing party" within the meaning of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, having achieved in these consent decrees a substantial part of the relief sought when the cases were filed, see *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) (consent decree may provide basis for attorney's fee award under § 1988), and that no "special circumstances" existed to justify a refusal to award plaintiffs their fees. *See* S.Rep. No. 94–1011, 94th Cong., 2d Sess. 4, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5908, 5912. Thus, plaintiffs' counsel are entitled to an award of attorneys' fees for their work in these cases; the only question that remains concerns the amount to be awarded.

■ In determining the amount of attorneys' fees to award to a prevailing party under § 1988, courts in the Ninth Circuit have, following the approach taken by the Court of Appeals for the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), first determined a "lodestar" figure representing the hours reasonably expended on the case by the attorney seeking the fee, multiplied by the hourly

---

1. Three separate actions were filed against the City of Richmond: *White v. City of Richmond,* No. C–79–1184 WHO; *Royal v. City of Richmond,* No. C–80–0433 WHO; and *Evans v. City of Richmond,* No. C–80–4022 WHO; the claims of the twenty-seven individual plaintiffs were consolidated for discovery (but not for trial) on April 24, 1981. Consent decrees were achieved in all three cases, and the present motion for attorneys' fees under 42 U.S.C. § 1988 relates to work done on all three cases.

2. The complaint in *White v. City of Richmond* sought an order requiring defendants to:

"adopt an affirmative program of compliance with the provisions of the Federal Civil Rights Acts in order to insure that in the future all complaints of police brutality are investigated by an independent monitor, to be appointed by the court, to insure that future complaints of police misconduct are thoroughly and properly investigated, and that appropriate disciplinary actions is imposed when complaints are substantiated." Complaint at 20.

rate which that attorney could reasonably command for his services in the private market. See *Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240 (9th Cir.1982); *Manhart v. City of Los Angeles,* 652 F.2d 904 (9th Cir.1981); *Dennis v. Chang,* 611 F.2d 1302 (9th Cir.1980). These courts have then considered the twelve factors enumerated· in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), in determining whether the award of a positive or negative multiplier is warranted under the circumstances of the case, and if so, of what magnitude that multiplier should be. The Court considers this "lodestar plus ·multiplier" approach, through which the district court utilizes the *Lindy* lodestar mechanism as a framework for applying the *Kerr* factors, to be the most rational means of arriving at an appropriate award of attorneys' fees. See *In re Capital Underwriters Securities Litigation,* 519 F.Supp. 92, 100 (N.D. Cal.1981). Accordingly, it adopts this approach here.

Plaintiffs' three attorneys in this case, Messrs. Oliver Jones, John Scott, and Rufus Cole, claim a combined total of 3800.65 [3] hours: 2104.35 for Jones, 1581.10 for Scott, and 115.20 for Cole. Although these hours are for the most part reasonable, the Court has found it necessary to exclude certain hours.

First, on many occasions phone calls between Messrs. Jones and Scott were recorded as having continued for different periods of time on each attorney's time sheets, or in some instances were never recorded at all. When this occurred, the Court reduced the hours for the call to the lower of the two time periods recorded; or, where the call was not recorded by one attorney, to zero. On this basis, 15.2 hours were deducted from Mr. Jones' hours, 20.6 hours were deducted from Mr. Scott's hours, and .6 hours were deducted from Mr. Cole's hours.

Second, because the consent decrees in these cases reserved the issue of attorneys'

fees relating only to the nonmonetary portions of the decrees, see ¶ 15(c) of the *Evans* and *White* decree, and ¶ 8 of the *Royal* decree, the Court has deducted from the requested hours 8.9 hours spent by Mr. Jones and 5.6 hours spent by Mr. Scott on the damage claims of individual plaintiffs, *e.g.* time spent reviewing medical evidence and interviewing potential expert medical witnesses. Hours spent pursuing individual damage awards, *i.e.,* the monetary portion of relief, pursuant to the arbitration procedure set out in the September 8, 1981, stipulation re monetary claims entered into between the parties, may, where appropriate, be compensated at a later date; they are not compensable here.

Third, both Messrs. Jones and Scott have included in their hours time spent pursuing attorneys' fees in this case. While the law is clear that an attorney is entitled to compensation for time reasonably spent in pursuit of his fee under 42 U.S.C. § 1988, *Manhart, supra,* 652 F.2d at 909, plaintiffs' attorneys have in this case hired special counsel to prepare this motion for attorneys' fees. Therefore, any hours spent by plaintiffs' counsel in pursuit of attorneys' fees ·were spent as clients, rather than as attorneys, and these hours are not compensable. See *Westerlund v. Fireman's Fund Insurance Co.,* 24 FEP Cases 1190 (N.D.Cal. 1980). Accordingly, this Court has deducted 27.3 hours spent by Mr. Jones in pursuit of his fees, and has· deducted 21.4 such hours from Mr. Scott's total.

Finally, although the Court con-· siders the large majority of ·the ·hours claimed by plaintiffs' attorneys to have been reasonably expended, both Messrs. Jones and Scott's time sheets reveal certain hours to have been expended unreasonably for purposes of an award of attorneys' fees under § 1988. Mr. Scott included much of his travel time between San Francisco and Richmond, as well as time spent discussing business over lunch, time which, common

---

**3.** Although plaintiffs' memorandum in support of the motion for attorneys' fees states that plaintiffs are seeking compensation for 3797.15 hours (memorandum at 15), the time sheets

provided in support of the motion disclose that the correct number of hours for which fees are being sought is 3800.65.

experience instructs, is never spent in an entirely efficient manner. Mr. Jones also includes certain unnecessary hours in his time sheets, including a luncheon meeting, some travel time, and certain general meetings of the NAACP which appear to have been spent reporting on, rather than working on, this litigation. Accordingly, the Court has deducted 21.75 hours from Mr. Scott's total claimed hours, leaving, when combined with other reductions, a total of 1511.75 compensable hours; 8.9 hours from Mr. Jones' total claimed hours, leaving a total of 2043 compensable hours; and .6 hours from Mr. Cole's claimed hours, leaving a total of 114.6 compensable hours.

■ The next step in determining the "lodestar" under *Lindy* is to set a reasonable hourly rate for each of plaintiffs' attorneys. The hourly rate to be awarded in cases under § 1988 should be that which private counsel of similar experience, reputation, and skill can command in cases of similar complexity in the community.[4] *Dennis, supra,* 611 F.2d at 1308; *In re Equity Funding Corp.,* 438 F.Supp. 1303, 1329 (C.D.Cal.1977). The Court has considered the declarations of Steven Mayer, Lee Rosenthal, and Guy Saperstein, offered in support of the application for attorneys' fees, stating the approximate rates which private counsel with Messrs. Jones, Scott, and Cole's experience and reputation would

charge in a case such as this in this community. The Court has also considered the hourly rates awarded by other courts in similar types of cases. *See, e.g., Westerlund, supra* ($125 per hour); *Keith v. Volpe,* 501 F.Supp. 403, 412 (C.D.Cal.1980) ($117.50 per hour); *Vulcan Society v. City of White Plains,* 533 F.Supp. 1054 (S.D.N.Y.1982) ($110 per hour). Based upon this information, and applying present rates in order to compensate for the effects of inflation, *see Chrapliwy v. Uniroyal, Inc.,* 509 F.Supp. 442 (N.D.Ind.1981), aff'd 670 F.2d 760 (7th Cir. 1982), the Court finds that Messrs. Jones and Cole should be compensated for their work in this case at a rate of $120 per hour. Mr. Scott, having graduated from law school three years after Messrs. Jones and Cole, will be compensated at a rate of $115 per hour.

■ Thus, multiplying each attorney's hours by the hourly rate at which they will be compensated, Mr. Scott's lodestar figure is $173,851.25; Mr. Jones' is $245,160; and Mr. Cole's is $13,680. These lodestar figures represent base amounts, and do not take into account the extraordinary nature of the relief achieved in these cases, the contingent character of the fee award, or many of the other factors which *Kerr* instructs the district court to consider in reaching a final fee award.[5] The Court has considered the *Kerr* factors,[6] however, and

---

4. Mr. Jones received his juris doctor degree from the School of Law (Boalt Hall) at the University of California at Berkeley in 1973, and received a masters degree in City Planning from the University of California at Berkeley in 1975. He has served as counsel for the Western Division of the National Association for the Advancement of Colored People (NAACP) since 1976.

Mr. Scott graduated from Golden Gate University School of Law in 1976, and has been a partner in the firm of Cole & Scott since 1978, specializing in civil rights litigation in the federal courts.

Mr. Cole received his juris doctor degree from the University of Michigan School of Law in 1973. He has been a partner in the firm of Scott & Cole since 1978.

5. The twelve factors to be considered under *Kerr* are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service

properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975).

6. As this Court recognized in *In re Capital Underwriters Securities Litigation,* 519 F.Supp. 92, 99 (N.D.Cal.1981), there is a certain amount of redundancy among the various *Kerr* factors, and certain factors, such as the time and labor involved in the case, the skill needed to perform the legal service properly, the skill, reputation, and ability of the attorneys, and the customary fee, involve considerations which

for the reasons set forth below, finds that the application of a positive multiplier is appropriate in this case.[7]

■ As noted by the Court of Appeals for the Third Circuit in Lindy, one extremely important factor which a court must consider in determining an award of attorneys' fees is the contingent nature of success; for every successful civil rights action brought, several more may be lost, and in these no fee will be received. Lindy, supra, 487 F.2d at 168. When a civil rights action is successful, therefore, the attorneys must be rewarded, not only for the hours reasonably expended in prosecuting the action, but also for the risk that no fee would ever be forthcoming. See Copeland v. Marshall, 641 F.2d 880, 892–93 (D.C.Cir.1980); Detroit v. Grinnell Corp., 495 F.2d 448, 471 (2d Cir.1974); In re Equity Funding Corp., supra, 438 F.Supp. 1326–27.[8]

■ When the first of these cases was filed in 1979, the chances of obtaining sweeping injunctive relief of the kind contained in the consent decrees ultimately agreed to must have appeared to be remote. The Supreme Court's decision in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), made such injunctive relief generally unavailable against municipalities, except where it can be proven that supervisory city officials have adopted or affirmatively approved of a pattern or practice of constitutional violation. That plaintiffs' counsel were able to obtain the consent decrees they did is testimony to their skill and persistence; it is not, as defendants' counsel asserts, because these cases were "free of risk." Moreover, despite the admirable cooperation exhibited by counsel for both sides during the prolonged mediation of the disputes in these cases, it appeared, even as late as May 15, 1981, when the parties appeared before the Court for a status conference, that settlement discussions might be broken off and that the cases would proceed to trial. A favorable outcome in these cases, and an award of attorneys' fees, was thus contingent from the start, and plaintiffs' counsel are entitled to compensation for assuming this risk.[9]

---

were subsumed in the determination of the lodestar amounts. The Court's discussion of the Kerr factors, therefore, will focus upon those which the Court found most relevant to its determination of the proper multiplier to apply in this case. See Rivera v. City of Riverside, 679 F.2d 795 (9th Cir.1982).

**7.** Defendants have argued that 42 U.S.C. § 1988 does not provide for the application of a multiplier in civil rights cases. Manhart v. City of Los Angeles, 652 F.2d 904 (9th Cir.1981), however, was brought under Title VII of the Civil Rights Act of 1964, and the court of appeals in that case affirmed the district court's use of a multiplier. Id. at 908. See also Keith v. Volpe, 501 F.Supp. 403 (C.D.Cal.1980).

**8.** As the district court for the Northern District of Indiana noted in Chrapliwy v. Uniroyal, Inc., 509 F.Supp. 442, 456 (N.D.Ind.1981), aff'd 670 F.2d 760 (7th Cir.1982):

"The congressional intent in allowing attorney's fees was, in part, to encourage individuals injured by discrimination to seek judicial review and to deter discrimination. Congress recognized, however, that this system would work only if the fee provided an incentive for competent lawyers to undertake such employment and to receive adequate compensation for the time they expend."

**9.** The settlement in this case was brought about, in part, through the diligent and skillful efforts of mediators Edward Howden and Richard Gray of the Community Relations Service of the Justice Department, who over the course of several months managed to temper the parties' positions to a point at which final agreement was possible. Defendants, however, now assert that plaintiffs' award of attorneys' fees should be reduced because the mediators played such a significant role in forging these consent decrees. Such a reduction is necessary, they argue, because otherwise no defendant will ever agree to mediation. This argument is, of course, specious: a party to litigation settles a case because he feels settlement will be in his best interests; the vehicle by which that settlement is achieved is irrelevant to the ultimate, usually economic decision of whether to settle.

Plaintiffs, on the other hand, seems to suggest that their fee should be increased at least in part because of their "trailblazing" use of mediation in reaching settlement in these cases. As noted above, the use of mediation is irrelevant to the decision as to whether a settlement proposal reached by any means should be accepted. To consider the role played by a mediator in determining an award of attorneys' fees would serve only to discourage the use of mediation, and the Court, wishing to encourage me-

■ Another factor which militates strongly in favor of awarding plaintiffs' attorneys a multiplier for their efforts in these cases is the extent of the relief they obtained in the consent decrees. In spite of the stringent requirements imposed in *Rizzo* for obtaining injunctive relief against municipal police department practices, the consent decrees achieved in these cases require significant changes in Richmond Police Department procedures. The decrees require the Department, among other things, to revise: its policies on the use of deadly and nondeadly force; its internal affairs procedures; its training programs and requirements for training rookie police officers, and for providing psychological counseling to all officers; and its personnel evaluation procedures. The monitoring provisions of the decrees, which require the Department to permit an independent monitor to inspect the Department's internal affairs and citizen complaint files, and to discuss individual cases with Department officials or with the City Attorney, are in and of themselves significant, as the declarations of experts David Rudovsky, Michael Avery, and Robert Gnaizda, offered in support of plaintiffs' motion for attorneys' fees, attest. Finally, the affirmative action program contained in the *Royal* decree sets high hiring and promotion goals for minorities in the Department. From January 1, 1981, onward, the Department must, under the terms of the decree, make every effort to ensure that 66 percent of the individuals appointed as police officers shall be minorities, and that 50 percent of the appointments to supervisory positions shall be minority police officers.. The results obtained by these decrees thus represent a significant achievement, and support the application of a multiplier to plaintiffs' fee award.

■ Although the contingent nature of the plaintiffs' cases and the extent of the success achieved are the factors that most strongly persuade this Court to increase plaintiffs' award of attorneys' fees through the application of a multiplier, several of the remaining *Kerr* factors also are relevant, if somewhat less significant. The legal questions involved in these cases were not complex, but, as noted earlier, the extent of the proof needed to obtain injunctive relief after the Supreme Court's decision in *Rizzo* was very great. These were not "undesirable" cases in the political sense of the word. Nevertheless, as the declarations of Amitai Schwartz, staff counsel of the Northern California Branch of the American Civil Liberties Union, and Michael Avery, adjunct professor of law at Northeastern University Law School, attest, it is difficult to find counsel willing to undertake large-scale police abuse cases such as these, largely due to the great expenditure of time necessary to prosecute such cases, and the rather slim possibility of success. Finally, two-and-a-half years passed between the filing of the initial complaints in these cases and settlement. During that period, both Messrs. Jones and Scott devoted a large portion of their time to this litigation, thus limiting their capacity to take on other, paying work.[10]

Thus, for all of the foregoing reasons, a multiplier of 1.5 will be applied to plaintiffs' lodestar attorneys' fees award figures to determine the final fee awards. Mr. Scott is, therefore, awarded $260,776.87 in attorney's fees; Mr. Jones is awarded $367,740 in attorney's fees; and Mr. Cole is awarded $20,520 in attorney's fees. Plaintiffs' attorneys are also awarded costs of $5,893, because expenses reasonably incurred incident to litigation are payable by defendant under 42 U.S.C. § 1988, *Thornberry, supra,* 676 F.2d at 1244–45, and the itemized costs provided by plaintiffs' attorneys are entirely reasonable.

■ Notwithstanding defendants' unsupported assertions to the contrary, it is settled that time spent litigating the issue

---

diation in cases such as these that are particularly well-suited to a negotiated settlement, declines to consider the fact that mediation was used in settling the cases in determining the fee award.

10. *See* declaration of John Scott in support of plaintiffs' motion for attorneys' fees and costs at 5.

of attorneys' fees is compensable under 42 U.S.C. § 1988. *Manhart, supra,* 652 F.2d at 909. The law firm of Altshuler & Berzon was engaged by plaintiffs' attorneys as special counsel to prepare and argue this motion for attorneys' fees; they are, therefore, entitled to fees under § 1988. Time records submitted to the Court by the firm, however, indicate that three attorneys and three law clerks spent a total of 486.30 hours working on this motion for attorneys' fees. The motion was well-prepared and well-argued, and each of the three lengthy briefs submitted by special counsel in support of the motion were exhaustively researched and persuasively written. Each of the twenty-four declarations advanced in support of the motion were similarly thorough. Nevertheless, 486 hours on a single motion, addressing issues which special counsel concede have all previously been decided by the Supreme Court of the United States or by the Court of Appeals for the Ninth Circuit in plaintiffs' favor, is in this Court's judgment excessive and unreasonable. Because it is impossible from an examination of special counsel's time records to determine precisely which hours were unnecessarily spent in preparing the motion, the Court, following a procedure employed by other courts, *see Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, 636–37 (6th Cir.1979); *Gagne v. Maher,* 455 F.Supp. 1344, 1349 (D.Conn.1978), *aff'd in part and remanded on other grounds* 594 F.2d 336 (2d Cir.1979), *aff'd* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), therefore reduces the hours of each attorney (and each law clerk) who worked on this attorneys' fee motion by 25 percent. The following number of hours are, therefore, compensable: Mr. Berzon—148.1 hours; Ms. Grillo—169.2 hours; Mr. M. Rubin—6.5 hours; Ms. Johnson—22.7 hours; Mr. J. Rubin—8.2 hours; and Mr. Kaplan—9.8 hours.

█ Under a fee arrangement between plaintiffs' counsel and the Altshuler and Berzon firm, plaintiffs' counsel agreed to compensate Mr. Berzon at the rate of $125 per hour, and to compensate Ms. Grillo and Mr. M. Rubin at the rate of $100 per hour.

Although special counsel contend that they customarily receive higher hourly fees than this, and agreed to these rates only due to the public interest nature of the cases, these rates appear to the Court to be reasonable under the circumstances, when considered in light of the relevant *Kerr* factors. Special counsel's fee in this case was not, unlike plaintiffs' counsel's, contingent; Altshuler & Berzon was guaranteed payment from the start. As noted earlier, the legal issues involved in preparing the motion for attorneys' fees were not difficult, but had all previously been decided by higher courts. Special counsel certainly performed with skill in preparing and arguing the motion, and obtained a positive result. It should be noted, however, that the Court's award to plaintiffs' counsel is far less than the $1.2 million requested. No particularly stringent time limits were imposed by the Court in its consideration of the motion, nor were these "undesirable" cases, or ones which required special counsel to forego other employment. Under these circumstances, the Court awards special counsel attorneys' fees at the following rates: Mr. Berzon—$125 per hour; Ms. Grillo and Mr. M. Rubin—$100 per hour; Ms. Johnson and Mr. J. Rubin—$30 per hour; and Mr. Kaplan—$25 per hour. Special counsel have not requested that the Court apply a multiplier, and the Court does not find the use of one appropriate. Thus, based on special counsel's hours and rates, as determined by the Court, the firm of Altshuler & Berzon is awarded attorneys' fees in the sum of $37,254.50.

█ Special counsel have also requested that they be awarded costs in the amount of $2,067.19. As itemized by special counsel, this figure includes $1,940.65 for photocopying costs. This item, for a single motion, is excessive. Therefore, the Court reduces it by $1,200. The remaining cost items appear to be reasonable. Special counsel are awarded costs in the sum of $867.65.

Accordingly, IT IS HEREBY ORDERED that:

136

1. Plaintiffs' counsel are awarded attorneys' fees under 42 U.S.C. § 1988 in the following amounts: Mr. Oliver Jones—$367,740; Mr. John Scott—$260,776.87; and Mr. Rufus Cole—$20,520.

2. Plaintiffs' counsel are awarded costs in the amount of $5,893.

3. The firm of Altshuler & Berzon, special counsel for plaintiffs', are awarded attorneys' fees in the amount of $37,254.50.

4. Altshuler & Berzon are awarded costs in the amount of $867.65.