**Thomas Neil HENDRICKSON, Jr.; Bertha M. Foy, a minor, by her next friend, Blake Parker; and Sessions Harper, a minor, by his next friend, Blake Harper; individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Terry E. BRANSTAD, individually and in his capacity as Governor of the State of Iowa; and Richard R. Ramsey, individually and in his capacity as Executive Director of the Iowa Criminal and Juvenile Justice Planning Agency, Defendants.**

No. 2C 84–3012.

United States District Court,
N.D. Iowa, C.D.

March 23, 1990.

638

Harry Swanger, St. Louis, Mo., Blake Parker, Fort Dodge, Iowa, for plaintiffs.

Carlton Salmons, Charles Phillips, Des Moines, Iowa, for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

Before the court are the parties' joint motions to dismiss this action on the basis of mootness, and plaintiffs' renewed motion for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. For the reasons discussed below, the court awards plaintiffs' counsel $276,163.09 in attorneys' fees and costs, and dismisses this action.

Plaintiffs commenced this case on February 2, 1984, alleging violations of due process, the eighth amendment prohibition against cruel and unusual punishment, statutory rights under the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5601, *et seq.* ("JJDPA"), and state and federal contract law arising from juvenile detention and jailing practices in Webster County, Iowa. The subsequent history of this litigation is outlined in this court's April 9, 1987 opinion in *Hendrickson v. Griggs*, 672 F.Supp. 1126 (N.D.Iowa 1987), and in the Eighth Circuit opinion in *Hendrickson v. Griggs*, 856 F.2d 1041 (8th Cir. 1988). This court ruled, *inter alia*, that juveniles could assert a 42 U.S.C. § 1983 action to seek redress for violations of rights created by the JJDPA, and that Iowa was required to submit a plan for achieving policy changes and reductions in the rate of juvenile jailing in adult jails to place the state in compliance with the JJDPA.

On May 4, 1987, the state filed its plan for reducing the rate of juvenile confinement in adult facilities, and supplemented the plan on May 21 to include reference to newly-enacted Iowa legislation regarding juvenile detention. *See* Iowa Code Ann. §§ 232.8, 232.22, 232.44, 805.1, 903.1 (West Supp.1989).[1] In August, 1988, the Circuit, on appeal by defendants, declined to reach the merits of this court's April 9, 1987 ruling, holding that the ruling was a nonappealable interlocutory order. *Hendrickson*, 856 F.2d at 1044-45.

Plaintiffs originally requested attorneys' fees and costs as prevailing parties under 42 U.S.C. § 1988 in an April 21, 1987 motion. This Court by order of May 7, 1987, held this motion to be "premature, and that plaintiffs' counsel should bring their motion once all substantive questions are resolved." The parties support their subsequent July 3, 1989 motions for dismissal or conclusion of plaintiffs' action with affidavits indicating that Iowa is now in compliance with the JJDPA. Plaintiffs' counsel thereupon renewed their request for attorneys' fees.

The parties jointly agree that the State of Iowa is now in compliance with the JJDPA. Therefore, the court finds that this case is moot and that dismissal of this action is appropriate.

Accordingly, plaintiffs' renewed motion for attorney's fees and costs is timely. Plaintiffs motion and defendants' resistance related thereto present three general questions. First, are plaintiffs a "prevailing party" within the meaning of 42 U.S.C. § 1988? Second, what is the proper amount of attorneys' fees and costs to be awarded in this case? Third, should an award of attorneys' fees and costs be apportioned among the county[2] and state defendants.

Defendants contend plaintiffs are not prevailing parties for two reasons. First, they assert that subsequently enacted Iowa

1. The Iowa legislation regarding juvenile detention, Senate File No. 522, was filed May 7, 1987 (28 days after this court's order), by the Senate Appropriations Committee, chaired by Senator Joe Welsh. The Iowa Senate passed the legislation on May 10th on a 37-0 vote, and the Iowa House approved the legislation on that same date on a 53-35 vote. The legislation was signed by Iowa Governor Terry Branstad on May 27, 1987. Those familiar with the legislative process will recognize that the filing and passing of this bill in three days was expeditious.

2. The various Webster County Defendants are not listed in the caption of this order because these defendants were dismissed by plaintiffs pursuant to this court's approval, *see* Clerk's Memorandum of Papers No. 177, of a March 14, 1989 Compromise and Settlement Agreement between the county defendants and plaintiffs. *See* Webster County Defendants' Ex. A, attached to Clerk's Memorandum of Papers No. 197. The original defendants hereinafter are referred to as "County Defendants" and "State Defendants".

legislation, and not plaintiffs' action and this court's April 9, 1987 ruling, was the cause of Iowa's compliance with the JJDPA and virtual elimination of the practice of holding juveniles in adult jails. Second and alternatively, they contend that plaintiffs are not prevailing parties because this court limited its discussion in its April 9, 1987 ruling, for purposes of plaintiffs' request for damages, solely to a finding of a private cause of action for juveniles under 42 U.S.C. § 1983, and this court did not address plaintiffs' eighth amendment and due process claims. As will be shown, neither of defendants' contentions has merit.

It is well-established that plaintiffs can be prevailing parties and entitled to attorneys' fees when substantial, but not complete, relief is obtained. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

> "Plaintiffs may be considered prevailing parties for attorneys' fees purposes if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit. This is a generous formulation that brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is reasonable."

*Id.* 103 S.Ct. at 1939, (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978); *see also Texas State Teachers Association v. Garland Independent School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (plaintiffs may be considered prevailing parties "if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit").

■ A change in legal relationship need not be a part of the ultimate relief ordered. An award is proper, for example, if a plaintiff's suit was a catalyst for the remedying of constitutional violations. *See, e.g., United Handicapped Federation*

*v. Andre*, 622 F.2d 342, 348 (8th Cir.1980); *Oldham v. Ehrlich*, 617 F.2d 163, 168 n. 9 (8th Cir.1980); *DeGidio v. Pung*, 723 F.Supp. 135, 138 (D.Minn.1989). In *United Handicapped Federation*, 622 F.2d at 348, the Eighth Circuit set out a two-part test for evaluating when a plaintiff has been a catalyst. First, the lawsuit and efforts of counsel must have been a "necessary and important factor in achieving the improvements." *Id.* at 346. Second, the changes or reforms accomplished must have been legally required and not merely gratuitous or voluntary. *Id.* (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 281 (1st Cir.1978).

■ Plaintiffs meet both of these conditions. Defendants acknowledge that plaintiffs' action and this court's injunctive relief preceded Iowa legislative action by more than three years. This chronological sequence of events is persuasive evidence that plaintiffs' lawsuit was a material factor promoting Iowa's compliance with the JJDPA. *See Coyote v. Roberts*, 502 F.Supp. 1342, 1351 (D.R.I.1980) (chronological sequence of events is persuasive, although not decisive, evidence). More importantly, Iowa's compliance with the JJDPA was more than voluntary or gratuitous; indeed, it was compelled by this court's order that Iowa submit a plan to bring the state into compliance with the JJDPA. Defendants' response that "the groundwork for the passage of the state legislation had been laid before this court's order of early 1987, and its passage without this order was probable, if not certain" is not borne out by the facts. As noted in the State Defendants' "Plan" for compliance with this court's April 9, 1987 ruling:

> "The State of Iowa will pursue legislation which conforms with the requirements of (the JJDPA). Most observers are confident of the bill's passage ... *the added weight of the court order on this matter is known to the members of the General Assembly.*"[3]

---

**3.** Perhaps less authoritative but no less telling is an editorial statement in the July 31, 1987 issue of The Des Moines Register that "[T]he new law (Iowa legislation addressing the juvenile jailing issue), *passed by the 1987 Legislature to conform* *with a federal judge's order* (this Court's April 9, 1987 order), appears to be appropriate [emphasis added]." *See Where to detain juveniles*, The Des Moines Register, July 31, 1987, at 8A, col. 1.

State Defendants "Plan", para. I [emphasis added]. As recognized by the Tenth Circuit in *Chicano Police Officer Assn. v. Stover,* 624 F.2d 127, 131 (10th Cir.1980), a lawsuit "can be the initial catalyst in producing action or can be the constant prodding that motivates a defendant to go further than it otherwise would have." Defendants' claim that Iowa legislative action was imminent is further defeated by this court's specific finding in its April 9, 1987 order that "[T]here is every indication that the jailing of juveniles will continue at an impermissibly high rate." *Hendrickson,* 672 F.Supp. at 1139. It is noteworthy here that before plaintiffs filed their second amended complaint to include the State Defendants, this court in 1985 invited the State's participation in this action, which participation the State declined.[4] If the State and/or the legislature had seriously been pushing legislative reform at that time, one might think that the State would have welcomed an opportunity to demonstrate this fact and to save litigation costs, especially when the existing juvenile jailing practices were under attack through plaintiffs' action.

■ Defendants' second contention, that plaintiffs did not prevail because this court did not address all their claims, also fails. In *Hensley,* the court addressed situations such as the one at bar which contain essentially a single claim, i.e., removal of juveniles from adult jails in Iowa based on alternative, multiple theories for relief (JJDPA, 8th and 5th/14th Amendments), and held that:

*[t]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.* Litigants in good faith may raise *alternative* legal grounds for a desired outcome, and the court's rejection of or *failure to reach certain grounds is not a sufficient reason for reducing the fee.* The *result* is what matters.

109 S.Ct. at 1040 [citations omitted] [emphasis added]. Plaintiffs obviously succeeded against the defendants through the court's favorable ruling in the April 9, 1987 order on plaintiffs' JJDPA claim. Although this court declined to address plaintiffs' eighth amendment and due process theories on mootness grounds, this is not a sufficient reason for reducing plaintiffs' attorneys' fees, much less grounds for arguing that plaintiffs are not prevailing parties. *See Gilbert v. City of Little Rock, Ark.,* 867 F.2d 1063, 1067 (8th Cir.1989) (when plaintiff has obtained excellent results, a fee award should not be reduced simply because plaintiff failed to prevail on every contention raised in the lawsuit).

In sum, this court concludes that plaintiffs were catalysts to bringing the State of Iowa into compliance with the JJDPA mandate that juveniles not be jailed in adult detention facilities, and are prevailing parties. As plaintiffs are entitled to an award of attorneys' fees under 1988, the next question is the proper amount.

Plaintiffs seek an award of attorneys' fees, costs, and expenses of $403,169.71. Their request can be summarized as follows:

| | Hours | Rate | Total Sought |
|---|---|---|---|
| Harry Swanger | 905.45 | 300.00 [5] | 271,635.00 |
| costs and expenses | | | 4,504.75 |

[Table continued on page 642]

**4.** *See* Clerk's Memorandum of Papers Nos. 72, 73, 77, 80, and 84. State Defendants declined to intervene in a November 25, 1985 submission to the court. Plaintiffs thereupon on February 18, 1985, filed their second amended complaint bringing State Defendants into the case.

**5.** This hourly rate reflects Swanger's request for an enhancement of 50% (1.5 multiplier) of his requested lodestar rate of $200.00/hour based

on (1) plaintiffs' exceptional success, the extraordinary results achieved, and the public importance of this litigation, and (2) the high risk factor and contingent nature of the case, the inclination to award enhancements to small law firms such as plaintiffs', and the similarity of this case to cases wherein a 1.5 multiplier was granted. *See infra* notes 10–15 and accompanying text.

| | Hours | Rate | Total Sought |
|---|---|---|---|
| Blake Parker | 547.75 | 150.00 [6] | 83,162.50 |
| costs and expenses | | | 4,159.27 |
| John Bird | 344.50 | 127.50 [7] | 43,751.50 |
| costs and expenses | | | 538.84 |
| | | | $407,751.86 |

Defendants strenuously object to plaintiffs' requested award. They object to the hourly rates sought by plaintiffs' counsel. They claim that plaintiffs' counsel have provided inflated time records and engaged in unnecessary duplicative efforts. They contend that an enhancement of the lodestar award is improper. They claim that certain expenses for discovery are improper. Finally, the State defendants contend that they are not liable for the costs of the litigation relating to the time period before they were brought into the suit as defendants through plaintiffs' second amended complaint.

### A. Lodestar Amount

■ The starting point in determining the appropriate amount of a fee award is the lodestar figure—the reasonable hourly rate multiplied by the number of hours reasonably expended. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939; *Shakopee Mdewakanton Sioux v. City of Prior Lake*, 771 F.2d 1153, 1160 (8th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986). Plaintiffs here contend that reasonable hourly rates for the three counsel are as follows: $200.00/hour for lead counsel Swanger; $100.00/hour for Parker; and $85.00/hour for Bird. They have submitted numerous comprehensive affidavits from experienced and renowned practitioners locally and in federal courts across the country, stating that the hourly rates sought are reasonable for lawyers of counsels' experience and skill. *See* Connelly, Ferleger, Susman, Soler, Barrett and Herring Affidavits.[8]

■ Although defendants argue that Swanger's requested rate is excessive when compared to that of local Iowa practitioners, numerous courts have held that a court may look beyond the local geographic market in considering the fair market value of an attorneys' services. A national market or a market for a particular legal specialization may provide the appropriate market. *See, e.g., Berry v. School Dist. of City of Benton Harbor*, 703 F.Supp. 1277, 1283 (W.D.Mich.1986); *Louisville Black Police Officers Organization v. City of Louisville*, 700 F.2d 268, 278 (6th Cir.1983); *see generally Blum v. Stenson*, 465 U.S. 886, 896, n. 11, 104 S.Ct. 1541, 1547, n. 11, 79 L.Ed.2d 891 (1984) (the prevailing rate is to be "in line with those prevailing in the [relevant] community for similar services by lawyers of reasonably comparable skill, experience and reputation."). Plaintiffs have submitted affidavits by nationally prominent federal civil rights litigators in juvenile and mental health law that have commanded fees at or close to Swanger's requested $200 rate (without enhancement). *See* Soler Aff., para. 10 ($180/hour with multiplier of 50% enhancing fee to

---

**6.** This hourly rate reflects Parker's request for an enhancement of 50% (1.5 multiplier) of his requested lodestar rate of $100.00/hour based on the reasons presented in note 4, *supra*.

**7.** This hourly rate reflects Bird's request for an enhancement of 50% (1.5 multiplier) of his requested lodestar rate of $85.00/hour based on the reasons presented in note 4, *supra*.

**8.** Although defendants' affidavits indicate that the applicants' requested rates generally are higher than rates normally charged by Iowa and St. Louis practitioners, defendants' submissions fail to address the novelty and complexity of the litigation involved here, and fail to consider the experience and reputation of the applicants and the rates charged by comparable practitioners. It is noteworthy that defendants' submissions do not indicate that the rates are unreasonable, only that they are not commonly charged rates. The court has considered these factors. *See* Mescher and Krehbiel Affidavits.

$270/hour rate); *see also* Susman and Ferleger Affs. This court takes notice that Swanger is a recognized national expert in juvenile law; he has been litigating juvenile cases since 1970, has lectured extensively, and has written numerous books, manuals and treatises in juvenile law and federal civil rights litigation. This court is persuaded that the relevant "community" of lawyers for determining Swanger's lodestar fee is the "community" of nationally prominent lawyers appearing in similar federal civil rights litigation.[9] Given the complexity of this litigation and Swanger's national reputation and experience, this court is persuaded that $180.00/hour is a reasonable rate for Swanger. It is comparable to the rate charged for similar work by nationally prominent federal civil rights litigators. Furthermore, this court is persuaded that $90.00/hour is a reasonable rate for Parker, and that $75.00/hour is a reasonable rate for Bird. These are comparable to the rates charged for similar work in the relevant communities. *See Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir.1982).

Defendants also argue that plaintiffs' counsel have provided inflated time records and engaged in unnecessary duplicative efforts. This court has carefully examined plaintiffs' submissions and finds that plaintiffs' hours are adequately documented and reasonable in amount. This case was complicated and "akin to a case of first impression." *See Hendrickson v. Griggs*, 672 F.Supp. 1126, 1130, n. 1 (N.D.Iowa 1987). As such, the case involved a great amount of investigative work which this court is persuaded would consume the hours claimed. In addition, plaintiffs submitted in their affidavits and this court finds that they divided responsibilities at the outset of the litigation to avoid duplication.[10] While defendants claim that it was inappropriate for plaintiffs to present two counsel at hearings, defendants on at least one occasion likewise presented two counsel.[11] This court finds that the use of co-counsel was at all times material, necessary, reasonable and common place for the complexity of this litigation. *Clifford v. Janklow*, 747 F.2d 1229, 1231 (8th Cir.1984); *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 139 (8th Cir.1982).

## B. Enhancement of the Lodestar

Plaintiffs' counsel request that their attorneys' fee awards be enhanced by 50 percent (1.5 multiplier) to account for (1) plaintiffs exceptional success, the extraordinary results achieved, and the public im-

---

9. Further support that the relevant "community" (for purposes of Swanger's fee request) is a "community" of nationally prominent federal civil rights litigators, is found in co-counsel Blake Parker's affidavit. Parker, at the time he conceived of the possibility of this litigation, made an effort to locate skilled Iowa practitioners to assist him. Parker attests:

"By this point in my inquiry I felt fairly comfortable that there were few, if any, attorneys in the State of Iowa who were able or willing to undertake what I perceived as extremely difficult and controversial civil rights litigation. I had discussed the case and made a good faith effort to identify and retain an attorney in the locality who was willing to assist on the case who also had knowledge of the peculiarities and particularities of juvenile law. *I consistently was getting referred to three national groups* [emphasis added]."
Parker Aff., para. 8.

10. Applicant Blake Parker asserts:

"16. [T]here has been a division of responsibility between my duties, the duties of Harry Swanger, and the assigned duties of John Bird. My duties entailed keeping track of the local facts concerning juvenile jail removal, pending Iowa legislation, and all other local matters. If there is any "duplication of effort", it has to do with phone calls between myself and co-counsel wherein we would discuss strategy, the direction of the case and further delineate current responsibilities of each attorney in the case. Little effort, if any, was spent in drafting similar documents, reviewing other's work or somehow spending time on the same item or duplicating services. It has been known from the outset that were we to be paid, if at all, it would not be by our clients but would be pursuant to the Civil Rights Attorney's Fees Award Act. We knew that duplication of effort would be criticized by the State and therefore might not be compensated by the Court. * * *"
Parker Aff., para. 17.

11. In any event, Local Rule 5(d)(3) for the Northern and Southern Districts of Iowa requires that attorneys not of this District must appear with associate (local) counsel.

portance of this litigation, and (2) the high risk factor and contingent nature of the case, the inclination to award contingency multipliers to small law firms such as plaintiffs', and the similarity of this case to cases wherein a 1.5 multipler was granted. This court has studied several recent cases in this circuit and other circuits discussing the "rare" and "exceptional" cases when an enhancement of the lodestar is justified,[12] and is persuaded that a 25 percent enhancement is appropriate here based on all of plaintiffs' presented reasons.

■ Generally, the lodestar award presumptively is a reasonable fee. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*). Many factors previously identified by courts as probative on the issue of "reasonableness" of a fee award, *see, e.g., Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976),[13] now generally are subsumed within the initial calculation of the lodestar amount. *Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984) ("the novelty and complexity of the issues," "the special skill and experience of counsel," the "quality of the representation," and the "results obtained" generally are subsumed within the lodestar). Although an upward adjustment of the lodestar may be justified, enhancements can only be made after " 'specific evidence' on the record and detailed findings by the lower courts." *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098 (quoting *Blum*, 465 U.S. at 899, 104

S.Ct. at 1549); *see also McKenzie v. Kennickell*, 875 F.2d 330, 338–39 (D.C.Cir.1989).

■ This court is persuaded that enhancement is appropriate based, in part, on plaintiffs' exceptional success and results achieved in establishing a private cause of action under 42 U.S.C. § 1983 permitting juveniles to obtain redress for violations of their rights created by the JJDPA, and requiring the State of Iowa to submit a plan for achieving compliance with the JJDPA. As stated by juvenile law expert Mark I. Soler:

"12. There is no question that the Court's opinion in this case ... is a landmark decision. It is the first comprehensive ruling that applies the federal Juvenile Justice and Delinquency Prevention Act to provide statewide relief for children in adult jails. The decision has resulted in virtually complete compliance with the Juvenile Justice Act, after years of violations, by the State of Iowa. Plaintiffs achieved complete success in requiring the removal of children from adult jails. In addition, the Court's decision has spurred advocacy efforts in many states throughout the country, and has been the subject of extensive discussion among lawyers for children and public officials.

13. When this litigation was filed in 1984, the class action claim under the Juvenile Justice Act was extremely speculative. The Youth Law Center had filed several actions with Juvenile Justice Act claims on behalf of *individual* children held in adult jails. In most of those cases (though not all), the courts upheld

---

**12.** *See, e.g., Ways v. City of Lincoln*, 871 F.2d 750, 758 (8th Cir.1989) (risk of nonpayment for work in a contingent fee case is an acceptable justification for enhancement if there is a demonstration that enhancement was necessary to attract local counsel); *Gilbert v. City of Little Rock, Ark.*, 867 F.2d 1063, 1067–68 (8th Cir. 1989) (enhancement permissible if risk of nonpayment for work in contingent fee case); *McKenzie v. Kennickell*, 875 F.2d 330, 332–39 (D.C.Cir.1989) (enhancements permissible for both contingency and quality of representation); *Wood v. Sunn*, 865 F.2d 982, 991 (9th Cir.1988) (risk of not prevailing is proper ground for enhancement).

**13.** The factors to be considered are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

the viability of the claim by denying motions to dismiss under Rule 12(b)(6) of the Federal Rules. However, none of the courts issued written decisions on the matter. And in none of the cases did. plaintiffs litigate the right to *statewide* relief under the Juvenile Justice Act. There was certainly no clearly-established law on the matter. Thus the relief obtained by plaintiffs in this matter was extraordinary, and attests to the exemplary efforts by Mr. Swanger and plaintiffs' other counsel." ·

Soler Aff., paras. 12, 13. Perhaps more telling, in view of its spontaneity, is a remark at the December 7, 1989 hearing on these attorneys' fees issues by Carlton G. Salmons, counsel for the Webster County Defendants.[14] Salmons acknowledged that, when this litigation began, he was angered but also "impressed by the ardor of the plaintiffs' attorneys to pursue [this litigation] in the absence of [court precedent]." This court is persuaded that this is one of the "rare" and "exceptional" cases in which plaintiffs' exceptional success and extraordinary results, as well as the public importance of. this litigation, provide sufficient reason for enhancement. *See McKenzie*, 875 F.2d at 339 (district court properly considered "exceptional results" and "quality of representation" as factors in awarding enhancement).

The risk of non-payment in "contingency" cases [15] such as this, the inclination to award enhancements to small law firms such as plaintiffs', and the similarity of this case to cases where enhancements were granted provide additional reasons for enhancement here. As recognized by the District of Columbia Circuit in *McKenzie*, 875 F.2d at 332, Justice O'Connor's opinion in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*") currently is the effective legal standard for contingency enhancements. Her test is two-fold. First, she urges lower courts to view contingency cases "as a class" and "treat a determination of how a particular market compensates for contingency as controlling future cases involving the same market." 107 S.Ct. at 3090. She emphasized that "at all times a fee applicant bears the burden of proving the degree to which the relevant· market compensates for contingency." *Id.* Second, Justice O'Connor agreed with the plurality in *Delaware Valley II* that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Id.* at 3091 (quoting plurality opinion, 107 S.Ct. at 3089).

As earlier noted, this action involved complex federal issues and was "akin to a case of first impression." *Hendrickson*, 672 F.Supp. at 1130, n. 1. This court therefore holds that the "relevant market" in this case is all contingency cases involving complex federal litigation, at the time this case was undertaken by counsel.[16] This definition of "relevant market" is consistent with congressional intent, *see* S.Rep. No. 1011, 94th Cong.2d Sess. 6 (1976), U.S. Code Cong. & Admin.News 1976, pp. 5908, 5913 ("it is intended that the amount of fees awarded under [section 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not

---

**14.** Although the Webster County Defendants were dismissed from this case prior to the December 7, 1989 hearing on attorneys' fees, *see supra* note 1, Salmons appeared at the hearing at the court's request.

**15.** This is not the usual contingency fee case where the attorney enters into a written contract with his clients for a percentage of any recovery. The juvenile clients received no recovery from the State. The "contingency" is that no attorneys' fees would be received unless plaintiffs' attorneys successfully prevailed and required the defendants to comply with federal jailing requirements.

**16.** As noted by the court in *McKenzie v. Kennickell*, 875 F.2d 330, 335 (D.C.Cir.1989) (quoting *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 381 (3rd. Cir.1987), "Title VII cases by themselves cannot qualify as a 'relevant market' because 'these types of cases are never compensated on a straight contingency and hence there is no relevant market for comparison."

be reduced because the rights involved may be nonpecuniary in nature.").

Given this standard of "relevant market," the court is persuaded that plaintiffs have satisfied their burden. They submitted affidavits from five nationally prominent practitioners of complex federal litigation to bolster their claim that a 50 percent enhancement (multiplier of 1.5 of the Lodestar) is appropriate and reasonable given the highly contingent and speculative nature of plaintiffs' action. *See McKenzie,* 875 F.2d at 336 (district court appropriately granted 50 percent enhancement in federal racial discrimination case). This court is persuaded, however, that a 25 percent enhancement (1.25 multiplier), not a 50 percent enhancement, is appropriate in this case. An enhancement of this size is comparable to increases granted in similar cases. *See, e.g., Craik v. Minnesota State University Board,* 738 F.2d 348, 350 (8th Cir.1984) (1.25 multiplier); *Yates v. Mobile County Personnel Board,* 719 F.2d 1530, 1534 (11th Cir.1983) (1.35 multiplier); *Graves v. Barnes,* 700 F.2d 220, 224 (5th Cir.1983) (2.0 multiplier); *Akron Center For Reproductive Health v. City of Akron,* 604 F.Supp. 1275, 1293 (N.D.Ohio 1985) (1.4 multiplier); *Arizona v. Maricopa County Medical Society,* 578 F.Supp. 1262, 1279 (D.Ariz.1984) (1.4 multiplier); *White v. City of Richmond,* 559 F.Supp. 127, 134 (N.D.Cal.1982), *aff'd,* 713 F.2d 458, 462 (9th Cir.1983) (1.5 multiplier); *Rajender v. University of Minnesota,* 546 F.Supp. 158, 170 (D.Minn.1982) (2.0 multiplier); *Clark v. City of Los Angeles,* 803 F.2d 987 (9th Cir.1986) (1.5 multiplier); *Carter v. Broadlawns Medical Center,* 672 F.Supp. 1149 (S.D.Iowa 1987) (1.10 multiplier); *Vulcan Society v. Fire Department of White Plains,* 533 F.Supp. 1054, 1065 (S.D.N.Y.

1982) (1.5 multiplier). Moreover, in recognition of cash flow difficulties and higher risk, courts have shown an inclination to award fee enhancements to small law firms such as plaintiffs' firms.[17] *See, e.g., Richardson v. Restaurant Marketing Associates, Inc.,* 527 F.Supp. 690, 702 (N.D.Cal. 1981); *Municipal Authority of the Town of Bloomsburg v. Pennsylvania,* 527 F.Supp. 982, 994 (M.D.Pa.1981).

Of course, Justice O'Connor also stated, in regard to the second prong of her test, that "no enhancement of risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.' " *Delaware Valley II,* 107 S.Ct. at 3091 (O'Connor, J., concurring in part and concurring in the judgment) (quoting plurality opinion); *see also Ways,* 871 F.2d at 758 (unless there is a demonstration that enhancement was necessary to attract competent local counsel in light of the risk of loss arising from the contingent fee arrangement, no enhancement based on risk of loss is permissible). As the District of Columbia Circuit recently recognized in *McKenzie,* 875 F.2d at 337, "[A]pplicants need not show that plaintiffs actually experienced difficulty in obtaining representation. They must only establish, according to the test formulated by Justice O'Connor, that plaintiffs *would have* faced 'substantial difficulties' in the absence of a contingency enhancement."

This court finds, as did the district court in *McKenzie v. Kennickell,* 684 F.Supp. 1097, 1098 (D.D.C.1988), that today "there exists a general dearth of counsel willing

---

**17.** Applicant Blake Parker asserts:

"17. Throughout the period of time that I have been representing (plaintiffs in this action), I have been precluded from accepting other cases. This has been an expensive case to litigate both in terms of attorney time spent and money which has been advanced. Because we have been representing juveniles, we could not expect any advancement of sums from the clients. In fact, even though the retainer agreement required a prepayment of $100, that was waived in each juveniles case.

Because of the size of my practice, it was determined by the partnership that complex cases of this nature would be limited." Parker Aff., para. 17. Iowa practitioner Victoria L. Herring likewise states:

"I also know that because of the realities of handling a sole- or small firm litigation practice in the civil rights arena in Iowa, attorneys must forego handling other cases and clients or delay working on other immediately compensable matters." Herring Aff., p. 2.

to accept [Title VII] [18] suits in the absence of [a contingency] enhancement." [19] This court is persuaded that but for a contingency enhancement in this case, plaintiffs would have encountered substantial difficulty in securing representation. Victoria Herring, a former Assistant Attorney General with the Iowa Civil Rights Commission, and presently a respected practitioner of civil rights litigation in the State of Iowa and federal courts, informs the court in her affidavit that "[T]here is a true economic disincentive to continue to represent plaintiffs in civil rights litigation without the possibility of an enhancement of fees for successful litigation." Herring Aff., p. 3. As earlier noted, plaintiffs' co-counsel, Blake Parker, advised in his affidavit that, after several inquiries, he was unable to locate any local Iowa practitioners who were able or willing to represent plaintiffs. Parker Aff., para. 8. Parker further advised that "this has been an expensive case to litigate," and that he has been "precluded from accepting other cases." *Id.* at para. 17. Also, John C. Barrett, a knowledgeable practitioner of civil rights litigation in Iowa and Federal courts, attests that:

> "12. In the past three years alone, in the civil rights area I know of one five-person Des Moines plaintiffs' law firm which failed, two other firms which made a conscious decision to accept substantially more hourly civil rights defense work in preference to plaintiff's work, and at least three additional individual attorneys who left private practice for salaried jobs. In each instance, I believe the more attractive economics of receiving compensation on an hourly basis, *rather than on a contingent basis at the rates currently being awarded by local courts,* were dominant considerations. I am also aware that one promi-

nent Des Moines civil rights firm now accepts plaintiff's cases only under terms by which the client agrees to pay both 40% of any monetary recovery *plus* all of the prevailing party's fee award at a rate presently sought of $135 per hour [emphasis added]."

Barrett Aff., para. 12.

This court is persuaded that plaintiffs' counsel have met their burden of establishing, under the second prong of Justice O'Connor's test, that in the absence of an enhancement for risk, plaintiffs would have faced substantial difficulty in finding competent counsel. Thus, this court finds that fee applicants Swanger, Parker and Bird are entitled to a 25 percent enhancement of their lodestar fee award.

### C. Costs and Expenses

Plaintiffs' counsel seek to recover their costs and expenses incurred in representing plaintiffs. Defendants challenge these expenses on grounds of duplication of travel time and unnecessary discovery. Defendants' challenges are unpersuasive. This court earlier concluded that given the complexity of this case, it was not unreasonable for plaintiffs to present two counsel at hearings (particularly when one was local counsel required by the rules). Defendants' claim that certain requested discovery costs should be disallowed because defendants did not challenge the statistics presented in the discovered materials also is not persuasive. This court has examined plaintiffs' supporting materials and is persuaded that the costs and expenses incurred were reasonably related to the presentation of plaintiffs' case and their ultimate success.

### D. Apportionment of Attorneys' Fees and Costs Among Defendants

 The final question before the court is the proper apportionment of attorneys'

---

**18.** Title VII and 42 U.S.C. § 1983 suits are analogous in that the respective statutory authority authorizes recovery of attorneys' fees by the prevailing party.

**19.** Iowa practitioner John C. Barrett states that "substantially less than 2% of the practicing bar in Iowa in fact practices in (civil rights litigation)." Barrett informs the court that "[a]ccord-

ing to 1988 statistics from the Iowa Commission on Continuing Education and Client Security, only 3 lawyers out of a total 6,965 active lawyer members admitted to practice in Iowa—or .043 percent of the bar—have registered themselves as "practicing primarily" in the areas of civil rights or constitutional law. Barrett Aff., para. 9; *see also* Parker Aff., para. 8.

fees and costs among defendants. Although plaintiffs filed their action on February 2, 1984, the State Defendants were not brought into the action until plaintiffs filed their second amended complaint on February 18, 1986. The State Defendants assert that because they did not participate in briefing and discovery in the case until that time, they cannot be held liable for the fees and costs related thereto.[20] Plaintiffs respond that the claims against all defendants were unitary from the inception of the case and that defendants' involvement was collective. Plaintiffs thus contend that the State Defendants should be jointly and severally liable for fees and costs.

Federal courts generally consider the following factors in determining proper apportionment of fees and costs: (1) the defendants' relative culpability; (2) the percentage of time that plaintiffs were forced to spend litigating against the respective defendants; (3) the relative ability of each defendant to pay; and (4) the inter-relatedness of the issues and claims. *See, e.g., Jenkins By Agyei v. State of Mo.,* 838 F.2d 260, 266 (8th Cir.1988); *Berry v. School Dist. of City of Benton Harbor,* 703 F.Supp. 1277, 1286 (W.D.Mich.1986). Upon reviewing the parties' briefs, other cases not therein included, and the extensive record of this case, this court is persuaded that State Defendants should be held liable for 90 percent of the awarded fees and costs, and that the County Defendants are responsible for 10 percent of the fees and costs which have already been satisfied in full.[21]

Although this case began as an action challenging certain jailing practices by the County Defendants, it became apparent at a certain point in the litigation that the constitutionality of a state statute and certain state policies were at issue. *See* Clerk's Memorandum of Papers No. 77. A centerpiece of this court's April 9, 1987 ruling was the entry of an order requiring the State Defendants to submit a plan for achieving policy changes and placing the state in compliance with the JJDPA. *Hendrickson,* 672 F.Supp. at 1143–44. In light of the State Defendants' primary responsibility for the county juvenile detention and jailing practices at issue,[22] this court is persuaded that the State Defendants should be liable for the attorneys' fees and costs now due.

The inter-relatedness of the issues and claims also suggests holding the State Defendants responsible. State Defendants place great reliance on the fact that they did not participate in briefing and discovery in the case until plaintiffs filed their second amended complaint on February 18, 1986. However, from that filing onward the claims against all defendants were virtually unitary and the defendants' involvement and defense was collective.

Finally, the percentage of time that plaintiffs devoted in their prosecution against each defendant is a factor. Applicant Blake Parker attests:

"13. In Exhibit "A", attached to this affidavit, I have set forth an accounting of the hours which I have spent working on this case to date. This accounting is based upon contemporaneous time records kept by myself. The contemporaneous time slips are then placed into a computer by my office staff for purposes of sorting and reporting. After careful review of this accounting *it is my opin-*

---

**20.** The State Defendants cite to the court *Becker v. Blum,* 487 F.Supp. 873 (D.C.N.Y.1980), wherein the court recognized that a district court has no authority to assess attorneys' fees against non-parties. In *Becker,* a party had requested that fees be apportioned among local social service departments *which were never parties to the lawsuit.* Thus *Becker* is inapposite here; the State Defendants in this case *are* parties to this lawsuit.

**21.** The County Defendants' responsibility for fees and costs has been satisfied in full by the terms of the Compromise and Settlement Agreement with plaintiffs, *see supra* note 2, approved by this court on March 22, 1989. By the terms of that agreement the County Defendants paid to plaintiffs the sum of $18,500.00, and plaintiffs acknowledged that they had no further claim for fees and costs against the County Defendants.

**22.** The conduct of the County Defendants as it related to the jailing of Juveniles even before the State Defendants were brought into this case, was based on what was being permitted throughout Iowa by express or implied approval of the State of Iowa. *Hendrickson,* 672 F.Supp. at 1138–39. Further, it was the State of Iowa that was taking federal funds and not fulfilling its promise to reduce such jailings. *Id.*

*ion that approximately 10% of the time is directly attributable to the relief sought solely from Defendant Webster County.* The remainder is attributable to the case in chief [emphasis added]."

Parker Aff., para. 13.

In conclusion, based on the record, the time sheets of plaintiffs' counsel, and the parties' briefs, the court holds that State Defendants shall be liable for 90 percent of the awarded attorneys' fees and costs, and that County Defendants by reason of the settlement owe no additional attorneys' fees or costs.

Based on all the above, the total amount of attorneys' fees and costs awarded to plaintiffs is as follows: [23]

| | Hours | Rate | Enhancement | |
|---|---|---|---|---|
| Harry Swanger | 905.45 | 180.00 | .25 | 203,726.25 |
| (costs and | | | | 4,504.75 |
| expenses) | | | | 208,231.00 |
| | | | | × 90% |
| | | | Total Award | 187,407.90 |

| | Hours | Rate | Enhancement | |
|---|---|---|---|---|
| Blake Parker | 547.75 | 90.00 | .25 | 61,621.88 |
| (costs and | | | | 4,159.27 |
| expenses) | | | | 65,781.15 |
| | | | | × 90% |
| | | | Total Award | 59,203.04 |

| | Hours | Rate | Enhancement | |
|---|---|---|---|---|
| John Bird | 344.50 | 75.00 | .25 | 32,296.88 |
| (costs and | | | | 538.84 |
| expenses) | | | | 32,835.72 |
| | | | | × 90% |
| | | | Total Award | 29,552.15 |

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1) plaintiffs' motion for costs and attorneys' fees is granted;

2) plaintiffs are awarded $276,163.09 in attorneys' fees, costs, and expenses, with individual awards as follows: Harry Swanger—$187,407.90; Blake Parker—$59,203.04; and John Bird—$29,552.15.

3) the State Defendants shall be liable for 100 percent of the awarded attorneys' fees, costs and expenses; and

4) the underlying cause of action shall be dismissed as the issues therein are now moot.

**23.** The hour totals reflect an award for plaintiffs' counsels' appellate work in this case. *See Hendrickson v. Griggs,* 856 F.2d 1041 (8th Cir. 1988); *see also Perkins v. Standard Oil Company of California,* 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970) (district courts have authority to award attorneys' fees for services performed during the appellate stages of a case). The court's chart of attorneys' fees set forth *infra* also indicates a 10 percent deduction from the fee award for each applicant to reflect the County Defendants' 10 percent liability (to reflect the 10 percent deduction, the court multiplied each applicant's fee award by 90 percent as indicated in the fee chart resulting in the net figure of fees due to each attorney).